756 So.2d 892 (1997)
Ronald Bert SMITH, Jr.
v.
STATE.
No. CR-95-0093.
Court of Criminal Appeals of Alabama.
December 19, 1997.
Opinion on Return to Remand April 3, 1998.
Rehearing Denied May 29, 1998.
*901 Michael Lawrence Fees, Huntsville; Jackie D. Ferguson, Huntsville; Richard A. Kempaner, Huntsville; and Charles H. Pullen, Huntsville, for appellant.
Bill Pryor, atty. gen., and Jack W. Willis, asst. atty. gen., for appellee.
BASCHAB, Judge.
The appellant, Ronald Bert Smith, Jr., was convicted of the murder of Casey Wilson. The murder was made capital because it occurred during a robbery in the first degree or an attempted robbery, see  13A-5-40(a)(2), Code of Alabama 1975. He was sentenced to death.
Smith appeals from this conviction and sentence, raising 22 issues. However, because we are remanding this cause to the trial court for a hearing on two issues, we forgo discussion of the remaining issues at this time.

I.
The appellant argues that the indictment returned against him was irreparably tainted because Ed Starnes, the foreperson of the grand jury that returned the indictment against him, is the father of Bill Starnes, a Madison County assistant district attorney. He contends that Ed Starnes's presence on the grand jury was presumptively prejudicial to his right to due process.
Initially, the record reflects that the appellant raised this issue for the first time in his motion for a new trial. Rule 12.9, Ala.R.Crim.P., states:
"(a) Procedure. The grand jury proceedings may be challenged only by written motion to dismiss the indictment, filed in the circuit court and alleging grounds therefor.
"(b) Timeliness. A motion under section (a) of this rule may be filed after an indictment is returned and before arraignment or by such later date as may be set by the court; provided, however, that if counsel is appointed for the first time at arraignment, the court shall give *902 counsel a reasonable time within which to file the motion."
There is no question that the appellant's motion was untimely. See, Pace v. State, 714 So.2d 316, 319-20 (Ala.Cr.App.1995), reversed in part and remanded, 714 So.2d 332 (Ala.1997). However, because this case involves the death penalty, we are required to search the record for plain error. Rule 45A, Ala.R.App.P.; Pace, supra.
The record indicates that, during the hearing on the appellant's motion for a new trial, the parties stipulated that Ed Starnes was the father of Bill Starnes, who is an assistant district attorney. It does not appear from the record that Bill Starnes was involved in any way with the investigation or prosecution of this case. The parties also stipulated that in Madison County the grand jury foreperson is picked randomly by drawing names from a hat. Neither party called witnesses to testify concerning this issue. The trial court denied the appellant's motion for a new trial.
In Cardwell v. State, 544 So.2d 987 (Ala. Cr.App.1988), we addressed a similar situation. In that case, the wife of an assistant district attorney served on the grand jury that indicted the defendant. On appeal, the defendant argued that her presence biased the grand jury and deprived him of his right to a fair trial. We remanded for the trial court to determine whether the wife discussed the details of that case with her husband at any time before the return of the indictment and whether she should be disqualified from serving as a grand juror, and to determine what role, if any, the wife had played in the grand jury's decision. We remanded the case[1] with the following instructions to the trial court:
"We remand this cause to the Circuit Court of Geneva County, Alabama with directions that the appellant and his counsel be present and that a hearing be conducted on the issue as originally raised. We further direct that a transcript of the hearing be prepared with appropriate findings set forth in writing by the trial judge determining whether or not there had been confidential information with reference to this cause exchanged between the Assistant District Attorney and his wife, or any discussions concerning this matter at any time between them, prior to the return of this indictment.
"Should the trial judge find that Mrs. Eldridge possessed no disqualifying knowledge when the grand jury was convened nor, in fact, were there any discussions prior to the return of the indictment, then Mrs. Eldridge was competent to serve as a member of the grand jury in question. Eddings v. State, 443 So.2d 1308 (Ala.Cr.App.1983). See also Noah v. State, 494 So.2d 870 (Ala.Cr.App.1986).
"Because of the necessity to clarify this issue, i.e., whether or not there were discussions between the Assistant District Attorney and his wife concerning this case prior to the convening of the grand jury, or during its deliberations, we hereby remand this cause for the hearing as stated. We further direct that a full hearing be conducted on the issues, as herein set forth, that both Mr. and Mrs. Eldridge be examined and that a transcript of such proceedings be promptly prepared and returned to this court, together with the trial court's written findings. Costello v. United *903 States, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956)."
544 So.2d at 988-89.
We are unable to determine from the record before us whether the assistant district attorney and his father discussed this case before the appellant was indicted. We therefore remand this cause and direct the trial court to conduct a hearing on this issue, with the appellant and his attorney present. The parties shall be permitted to subpoena such witnesses as they deem appropriate to testify at this hearing. The trial court shall make written findings of fact as to whether the assistant district attorney discussed this matter with his father at any time before the indictment was returned. If the trial court finds that Ed Starnes did not discuss this case with his son before the return of the indictment, then Mr. Starnes was competent to serve as a member of the grand jury in question. Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956); Cardwell, supra.
Alternatively, if the court finds that the assistant district attorney did discuss this case with his father before the indictment was returned, it shall make written findings of fact as to: (1) whether Assistant District Attorney Bill Starnes had any involvement in the investigation or prosecution of the appellant's case; (2) the number of times that Assistant District Attorney Starnes and his father, Ed Starnes, discussed this case before the appellant was indicted; and (3) the nature and content of each such discussion. The trial court shall then determine: (1) whether the fact that that the grand jury foreperson was the father of the assistant district attorney had any effect on the grand jury proceedings; and (2) whether, as a result of the discussions between Ed Starnes and his son, Ed Starnes should have been disqualified from sitting on the grand jury that indicted the appellant.

II.
The appellant next argues that his conviction and sentence should be reversed because of his contention that the State misrepresented to the jury the terms of the plea bargain Chad Roundtree, a codefendant, made with the State in return for his testimony against the appellant. The appellant further argues that Roundtree's testimony was vital to the State's case and that, because Roundtree significantly misstated the sentence that he would receive, he was denied the opportunity to prove Roundtree had a strong incentive to give false testimony against him.
The record indicates that Chad Roundtree testified he would be sentenced to life imprisonment with the possibility of parole in exchange for his testimony. On May 31, 1996, however, Roundtree was sentenced to 20 years in prison. The appellant did not present this issue to the trial court. Rather, he raised it for the first time in his second motion to supplement the record on appeal. The documents that were included with this motion were the case action summary and the sentencing order in Roundtree v. State (Second Supplemental Record at C. 94-95).
In its brief filed with this court, the State argues that the documents mentioned in the appellant's second motion to supplement the record were not offered to, or received by, the trial court. The State argues, therefore, that the record was improperly supplemented, and that the documents pertaining to Roundtree's case should be struck from this record.[2] We agree.
In Dobyne v. State, 672 So.2d 1319, 1327 (Ala.Cr.App.), 672 So.2d 1353 (Ala.Cr.App. 1994) (appeal after remand), affirmed, 672 So.2d 1354 (Ala.1995), cert. denied, 517 *904 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996), we held that Rule 10(g), Ala.R.App. P., does not apply when the evidence sought to be included in the record on appeal was never offered to or received by the trial court. "Rule 10(g) applies to `admitted or offered evidence that is material to any issue.'" Id., 672 So.2d at 1327 (citing Rule 10(g), Ala.R.App.P.).
"The appellant ... contends that the trial court erred in denying his motion to supplement the record. This argument has no merit. The appellant sought to supplement the record on appeal by including matter that was not introduced at the appellant's trial. Rule 10(f), A.R.App.P., governs the omission of material that was actually a part of the record below. Richburg v. Cromwell, 428 So.2d 621 (Ala.1983); Williams v. City of Northport, 557 So.2d 1272 (Ala.Civ.App.1989), cert. denied, 498 U.S. 822, 111 S.Ct. 71, 112 L.Ed.2d 45 (U.S.Ala.1990); Thomas v. State, 550 So.2d 1057 (Ala.Crim.App.1989), aff'd, State v. Thomas, 550 So.2d 1067 (Ala. 1989). In its denial of the motion, the trial court clearly stated that the matter the appellant sought to have included had never been before the trial court. Thus, the evidence could not have been properly added to the record on appeal."
Allen v. State, 598 So.2d 1031, 1034 (Ala. Cr.App.1992). See also, Dobyne v. State, supra.
"This court is bound by the certified record on appeal. The certified record provides no foundation for considering this issue." Id. at 1327. Because the documents pertaining to Roundtree's case were never admitted or offered into evidence in the present case, the State's motion to strike these documents is granted. Allen v. State, supra; Dobyne v. State, supra.
The question whether the terms of Chad Roundtree's plea agreement were misrepresented to the jury remains unanswered. Because of the severity of the punishment in this case and because of the specific facts involved in this issue, we believe the appellant should be afforded the opportunity to raise this issue before the trial court. See, DeMarco v. United States, 415 U.S. 449, 94 S.Ct. 1185, 39 L.Ed.2d 501 (1974) (in which the United States Supreme Court held it would be better to resolve any factual disputes concerning plea bargains before the trial court rather than a court of appeals).
We therefore remand this cause and direct the trial court to conduct a hearing with the appellant and his counsel present. The trial court shall permit the parties to subpoena witnesses to testify at this hearing. The trial court shall admit into evidence at this hearing a copy of the sentencing order and a transcript of the sentencing hearing in Roundtree v. State. We further direct that the trial court shall question Chad Roundtree; Roy Miller, his defense counsel; and Ken Taylor, assistant district attorney, about the plea agreement terms and the sentencing hearing. Finally, the trial court shall make a written determination as to whether the terms of Chad Roundtree's plea agreement were misrepresented to the jury.
The transcript of this hearing shall be prepared and returned to this court, together with the trial court's written findings of fact and conclusions of law as to both issues addressed in this opinion, within 63 days of the release of this opinion.
REMANDED WITH DIRECTIONS.
All judges concur.

On Return to Remand
BASCHAB, Judge.
The appellant, Ronald Bert Smith, Jr., was charged with the capital murder of Casey Wilson. The murder was made capital because it occurred during a robbery. See  13A-5-40(a)(2), Ala. Code 1975. The jury found the appellant guilty of capital murder and, by a vote of 7 to 5, recommended a sentence of life imprisonment without the possibility of parole. The trial court overrode the jury's recommendation and sentenced the appellant to death.
We initially remanded this case for the trial court to determine whether the indictment *905 was irreparably tainted because the grand jury foreman was the father of an assistant district attorney and to determine whether the terms of a plea agreement between the State and a codefendant had been misrepresented to the jury. See Smith v. State, 756 So.2d 892 (Ala.Cr.App. 1997). In accordance with our instructions, the trial court conducted a hearing and entered an order containing specific findings of fact concerning these issues. The case is now before us following that remand.
The relevant facts are set forth in the trial court's sentencing order, attached hereto as Appendix A, and in the remainder of this opinion.
The appellant presents several issues on appeal that he did not raise during his trial. Although he raised some of these issues in his motion for a new trial,
"[r]eview on appeal is restricted to questions and issues properly and timely raised at trial.... [A] motion for a new trial or a motion for a judgment of acquittal is not sufficient to preserve the issue where no timely objection was made at the time the evidence was offered and admitted."
Newsome v. State, 570 So.2d 703, 717 (Ala. Cr.App.1989) (citations omitted). Although a failure to object will not bar our review of an issue in a case involving the death penalty, it will weigh against any claim of prejudice. Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). Rule 45A, Ala. R. App. P., states:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
"[This] plain-error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)).

I
The appellant's first contention is that the trial court erroneously denied his request that the jury be sequestered during his trial. He asserts that Rule 19.3(a)(1), Ala. R. Crim. P., takes precedence over  12-16-9, Ala. Code 1975, and that, therefore, the trial court erred in allowing the jurors to separate without his consent. We recently addressed this issue and decided it adversely to the appellant in Stewart v. State, 730 So.2d 1203, 1212 (Ala.Cr. App.1997). See also Hyde v. State, [Ms. CR-95-2036, January 30, 1998] ___ So.2d ___ (Ala.Cr.App.1998).

II
The appellant's second contention is that the trial court improperly refused to charge the jury on manslaughter. He argues that such a charge should have been given because he alleges he was under the influence of alcohol when he committed the offense. The appellant did request a jury instruction on heat-of-passion manslaughter under  13A-6-3(a)(2), Ala. Code 1975, based on his contention that he was acting under the "heat of passion" when he committed the murder. However, he did not request an instruction on manslaughter based on his alleged intoxication.[1] Therefore, *906 we review this issue under the plain error rule. See Rule 45A, Ala. R. App. P.
Section 13A-1-9(b), Ala. Code 1975, which pertains to the charging of lesser included offenses, provides the following: "The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." (Emphasis supplied.) In Boyd v. State, 699 So.2d 967 (Ala.Cr.App.1997), we held:
"`A defendant accused of a greater offense is entitled to have the trial court charge on any lesser included offense if there is any reasonable theory from the evidence to support the lesser charge, regardless of whether the state or the defendant offers the evidence. Ex parte Pruitt, 457 So.2d 456 (Ala.1984); Parker v. State, 581 So.2d 1211 (Ala.Cr.App. 1990), cert. denied, 581 So.2d 1216 (Ala. 1991). A court may properly refuse to charge on a lesser included offense ... when ... it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense ... Anderson v. State, 507 So.2d 580 (Ala.Cr.App.1987).... Section 13A-1-9(b) provides, "The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense."'"
699 So.2d at 972.
"[I]ntoxication, whether voluntary or involuntary, is admissible in evidence whenever it is relevant to negate an element of the offense charged."  13A-3-2(a), Ala. Code 1975. In McConnico v. State, 551 So.2d 424 (Ala.Cr.App.1988), we held:
"While voluntary intoxication is never a defense to a criminal charge, it may negate the specific intent essential to a malicious killing and reduce it to manslaughter.  13A-3-2, Code of Alabama (1975) (Commentary). `"When the crime charged involves a specific intent, such as murder, and there is evidence of intoxication, the trial judge should instruct the jury on the lesser included offense of manslaughter." Gray v. State, 482 So.2d 1318, 1319 (Ala.Cr.App. 1985).' McNeil[McNeill] v. State, 496 So.2d 108, 109 (Ala.Cr.App.1986)."
551 So.2d at 426. However, to negate the specific intent required for a murder conviction, the degree of the accused's intoxication must amount to insanity.
"`In an assault and battery case, voluntary intoxication is no defense, unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent to injure. Lister v. State, 437 So.2d 622 (Ala.Cr.App.1983). The same standard is applicable in homicide cases. Crosslin [v. State, 446 So.2d 675 (Ala.Cr.App.1983) ]. Although intoxication in itself does not constitute a mental disease or defect within the meaning of  13A-3-1, Code of Alabama 1975, intoxication does include a disturbance of mental or physical capacities resulting from the introduction of any substance into the body.  13A-3-2. The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill....'
"Ex parte Bankhead, 585 So.2d 112, 121 (Ala.1991)."
Smith v. State, 646 So.2d 704, 712-13 (Ala. Cr.App.1994).
The record does not support the appellant's claim that he was intoxicated when he killed Casey Wilson. Chad Roundtree testified that the appellant drank one-half of a can of beer some time before he killed Wilson. Roundtree also testified that, before he left the truck to enter the Circle C store, the appellant stated that he intended to kill Wilson and that he bragged about the killing afterward. Roundtree stated that the appellant *907 was sober at the time of the murder. Moreover, Roundtree testified that he was so afraid he could not properly drive the truck away from the store. Therefore, he testified, the appellant ordered him to stop the truck and let him drive. Roundtree testified that the appellant drove the rest of the way home without any difficulty.
The appellant's own testimony falls far short of providing a basis for a manslaughter instruction. The appellant testified that he drank a 32-ounce "mug" of gin before he committed the murder. However, he never testified that he was intoxicated, that he was so drunk he could not form the intent to kill the victim, or that he could not appreciate the criminality of his conduct at the time of the murder. In fact, he specifically testified at trial that he intended to kill Casey Wilson. Moreover, his actions during and after the murder refute his argument because they provide no evidence that he was mentally impaired in any manner when he killed Wilson. The appellant was sufficiently coherent and aware of the seriousness of his conduct to remove the film cassette from the store's surveillance camera, which was housed in a locked box, before he left the building. Finally, he was not too intoxicated to drive part of the way home after the murder.
Thus, there was no evidence to show that the appellant was so intoxicated that he could not appreciate the criminality of his conduct. Because there was no reasonable theory under the facts of this case to support an instruction on manslaughter, we decide this issue adversely to the appellant.  13A-1-9(b), Ala. Code 1975; Boyd v. State, supra.
Moreover, the trial court instructed the jury on the offenses of capital murder, intentional murder, and robbery in the first degree, and the jury convicted the appellant of capital murder. Therefore, it is reasonable to conclude that an instruction on any other lesser included offense would not have affected the outcome of the case. Roberts v. State, 735 So.2d 1244 (Ala.Cr.App.1997); Gaddy v. State, 698 So.2d 1100 (Ala.Cr.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997). Thus, the refusal to instruct on manslaughter was, at most, harmless error.

III
The appellant's third contention is that his lead counsel improperly divulged information relating to his theory of defense by talking to a television reporter and by cross-examining the State's first witness, the victim's widow, about relationships the victim had allegedly had with other women. He contends that lead counsel's actions prematurely disclosed his "jealous rage" defense to the State and revealed to the State the name of the key defense witness, who subsequently testified for the State. Therefore, he argues that lead counsel's conduct created a conflict of interest that deprived him of his right to counsel, right to present a defense, and right to a fair trial and sentencing guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and by the Alabama Constitution.
Based on information provided by the appellant and obtained through discovery, the appellant's two trial attorneys spent nearly a year preparing to defend this case as though it was a murder that occurred during a robbery. Even the appellant's statements to his friends indicated that his motive for going to the store was to rob it. However, four days before his trial began, the appellant informed his attorneys that he had committed the murder because of a "jealous rage." He alleged that Wilson was seeing a woman with whom the appellant had had a sexual relationship and that he killed Wilson because he was in a "jealous rage" over his alleged relationship with that woman.
On August 1, 1995, lead counsel allegedly requested the name of the woman. Cocounsel told him that her name was Ursula Stehle, but allegedly cautioned lead counsel *908 not to reveal this witness's name or to make the State aware of the new defense. The appellant alleges that cocounsel met with Stehle on August 2, 1995, to prepare her for trial and that Stehle was "still willing to testify" about her purported relationship with the appellant when counsel left the meeting. Cocounsel says she was watching the local television news broadcast when she heard the following report concerning this case:
"We've been told by sources within the defense that they will try to prove this wasn't a capital case at all, this was more or less a case of heat of passion, that Smith apparently went to the store because he learned that Wilson was running around with his girlfriend and then shot [Wilson] and then tried to cover it up to make it look like a robbery."
(CR. 215). After hearing this report, cocounsel allegedly telephoned lead counsel and informed him that she, thought he had "severely compromised" the defense. Thereafter, Stehle allegedly advised cocounsel that she was not going to testify for the defense.
On August 3, 1995, the third day of trial, cocounsel filed a motion for the removal of lead counsel, for a mistrial, and to withdraw as attorney. (CR. 214-17). The trial court held a hearing at which all of the attorneys and Smith were present. Cocounsel presented argument, but she did not offer any evidence to support her allegations. The trial court denied the motion following the hearing.
In Browning v. State, 607 So.2d 339 (Ala.Cr.App.1992), we held:
"For counsel to be so ineffective in a conflict of interest context that an accused has been denied his Sixth Amendment right to counsel, counsel must be hampered by an `actual conflict of interest.' Ex parte Parker, 704 S.W.2d 40, 41 (Tex.Ct.App.1986); Baty v. Balkcom, 661 F.2d 391 (5th Cir.1981), cert. denied, 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982).
"What is an `actual' conflict of interest? An actual conflict is a real conflict. McConico v. Alabama, 919 F.2d 1543, 1546 (11th Cir.1990). `A possible, speculative or merely hypothetical conflict does not suffice.' Lightbourne v. Dugger, 829 F.2d 1012, 1023 (11th Cir.1987), cert. denied, 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988). `An actual conflict of interest occurs when a defense attorney places himself in a situation "inherently conducive to divided loyalties." Castillo [v. Estelle, 504 F.2d 1243 (5th Cir.1974)] at 1245.' Zuck v. Alabama, 588 F.2d 436, 439 (5th Cir.), cert. denied, 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979); United States v. Carpenter, 769 F.2d 258, 263 (5th Cir.1985). See also Smith v. White, 815 F.2d 1401 (11th Cir.1987), cert. denied, 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987). To prove that counsel was hampered by an actual conflict of interest, the appellant must show inconsistent interests. Smith v. White, 815 F.2d at 1404."
607 So.2d at 342. "In order to demonstrate a violation of his Sixth Amendment rights, a defendant must show that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980). In the absence of an actual conflict of interest, specific prejudice must be shown. Castillo v. Estelle, 504 F.2d 1243, 1244 (5th Cir.1974).
The appellant presented no evidence at the motion hearing that his attorney had any improper motive for discussing this case with members of the media, that an "actual" conflict of interest existed, or that lead counsel's actions impaired his defense in any way. Cuyler, supra; Browning, supra. The appellant argues in his brief to this court that lead counsel's motive for talking to members of the media may have been self-promotion, but he presented no evidence to support that allegation. It takes more than speculation to prove an actual conflict of interest. Id. The appellant also alleged that, as a result of the news report, Ursula Stehle would be *909 a hostile witness and that her testimony would be inconsistent with the statement she previously allegedly gave to cocounsel. The appellant could have called Stehle to testify at the hearing, but he did not do so.[2] In fact, the only person who testified was the appellant, who responded to the trial court's question about why he had not told his attorneys of his "jealous rage" defense until just before trial.
Moreover, during the hearing on the motion, the trial judge told cocounsel that he would allow her to testify if Stehle's trial testimony was inconsistent with her previous statements to cocounsel. Nonetheless, the defense did not object following Stehle's testimony, and cocounsel did not testify about her prior conversations with Stehle. Additionally, the defense was able to rebut Stehle's testimony that she did not have a sexual relationship with the appellant through the testimony of several witnesses who indicated that the appellant and Stehle had indeed had such a relationship.
The appellant argues that the disclosure of information concerning the defense and Stehle to members of the media and to the prosecution violated Rule 1.6, Alabama Rules of Professional Conduct, which precludes an attorney from disclosing confidential information relating to the representation of a client without the client's consent. The appellant did not specifically argue before the trial court that lead counsel violated this rule. Therefore, we review this issue under the plain error rule. Rule 45A, Ala. R. App. P.
Rule 3.6(c), "Trial Publicity," Alabama Rules of Professional Conduct, provides, in pertinent part, as follows:
"[A] lawyer involved in the investigation or litigation of a matter may state without elaboration:
"(1) The general nature of the claim or defense ..."
Further, Rule 1.6 excludes from its scope "disclosures that are impliedly authorized in order to carry out the representation...." Id. Thus, lead counsel did not violate the Rules of Professional Conduct when he made the strategic decision to discuss these matters with members of the news media. The information lead counsel gave the reporter falls within the scope of Rule 3.6(c)(1) because it simply presented the general nature of the defense he intended to present. Therefore, lead counsel's actions do not constitute error, and certainly not plain error.
The appellant further argues that lead counsel created a conflict of interest by cross-examining the State's first witness, the victim's widow, about whether her husband had engaged in extra-marital affairs with other women. He argues that both he and cocounsel had requested that lead counsel not engage in such cross-examination. He also alleges that the questions lead counsel asked on cross-examination forewarned the State of his "jealous rage" defense. We disagree. This was a decision involving trial tactics that was properly made by lead counsel and not by the appellant, cocounsel, or this court. The trial court plainly stated during the hearing on cocounsel's motion that he had appointed lead counsel to the case because of his experience in criminal law (he had practiced criminal law for approximately 32-33 years and had been involved in over 60 homicide cases), and that cocounsel had been appointed to assist him in the investigation of this case and in the preparation of the defense. (R. 982-83). "A mere difference of opinion between the appellant and [his] trial counsel as to trial strategy is insufficient to render counsel's performance ineffective under the Strickland [v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)] test. Stone v. State, 579 So.2d 702 (Ala.Cr.App. 1991)." Patrick v. State, 680 So.2d 959, 962 (Ala.Cr.App.1996).
*910 Although it is not our function to second-guess the strategic decisions made by counsel, it is not difficult to see the benefits the appellant stood to gain because of lead counsel's decision to cross-examine the victim's widow or to realize the peril that could have resulted had he not done so. The victim's widow was the State's first witness. Thus, the defense had the chance to raise the question of the victim's character early in the trial. Counsel began this process by asking the victim's wife why the victim, who had a college education, was working in a convenience store. He completed the process by asking her about the victim's faithfulness. As a result of lead counsel's cross-examination of the victim's widow, the defense was able to put the appellant's theory of the case before the jury with the State's first witness rather than waiting until its case-in-chief. Thus, if the appellant had chosen not to testify, his defense would, in effect, still have been before the jury.
The appellant finally argues that as a result of lead counsel's actions, he was forced to testify because Stehle denied having any romantic involvement with him or the victim. We disagree. Our review of the record indicates that the evidence against the appellant, including his statement to the police, was compelling. His statement to the police and statements he made to Ferguson and Ickes were inconsistent with his defense at trial. He was, in effect, the only witness who could have testified about his "jealous rage" defense. Therefore, his argument that lead counsel's actions forced him to testify is without merit.
The appellant did not prove that lead counsel had an actual conflict of interest, as required by Browning, supra. Neither has he shown specific prejudice as a result of lead counsel's actions, as required by Castillo, supra. Further, he has not shown that lead counsel violated the Rules of Professional Conduct. Therefore, his arguments in this regard must fail.

IV
The appellant's fourth contention is that the State presented improper testimony at the trial court's sentencing hearing after the jury had recommended a sentence of life imprisonment without the possibility of parole.

A
First, the appellant argues that the trial court erred in allowing the victim's family to testify about the appellant's truthfulness, character, and lack of remorse during the second sentencing hearing.
1. Testimony about the appellant's lack of remorse
The appellant argues that the victim's family's testimony about his lack of remorse violates the principle that a victim's family may not testify as to their characterizations or opinions about the defendant, the crime, or the appropriate punishment. Ex parte McWilliams, 640 So.2d 1015 (Ala.1993), on remand, 640 So.2d 1025 (Ala.Cr.App.1994), opinion after remand, 666 So.2d 89 (Ala.Cr.App.), aff'd, 666 So.2d 90 (Ala.1995), cert. denied, 516 U.S. 1053, 116 S.Ct. 723, 133 L.Ed.2d 675 (1996); see also Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). The appellant did not make a timely objection to the family's testimony about his lack of remorse. Therefore, we will review this issue under the plain error rule. Ex parte Land, 678 So.2d 224, 232 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996).
The appellant presented evidence during the sentencing hearing before the jury that he was remorseful about the crime. (R. at 1547-48). During the sentencing hearing before the trial court, the victim's wife, mother, and father testified that the appellant had never expressed any remorse to them. This was factual evidence that was properly presented to rebut the appellant's evidence that he was remorseful.
*911 The appellant also argues that certain portions of the family's testimony dealing with his lack of remorse were impermissible because a witness is not allowed to testify as to what another thinks and feels. This court presumes that the trial court disregarded any inadmissible evidence in sentencing. Sockwell v. State, 675 So.2d 4, 36 (Ala.Cr.App.1993), aff'd, 675 So.2d 38 (Ala.), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996). In its sentencing order, the trial court stated, the defendant's contention that he was remorseful had been refuted. The trial court also stated that the evidence it relied upon to reach this determination was the appellant's "swaggering and boasting after this murder, his demeanor when questioned by Investigator Payne, and his testimony." There is nothing in the record to indicate the trial court considered the testimony of the victim's family about the appellant's lack of remorse. Furthermore, although the family members did offer their opinions about the appellant's contention that he was remorseful, they did not offer their opinions on the appellant's character, the crime, or the appropriate punishment. Therefore, we find no plain error in allowing the testimony.

2. Testimony about the credibility of the appellant's defense
The appellant also argues that the trial court erred in allowing the victim's family to testify about the credibility of the appellant's defense during the second sentencing hearing. Because the appellant did not make a timely objection to this testimony during the sentencing hearing, we must review this issue under the plain error rule. Rule 45A, Ala. R. Crim. P. During its closing arguments in the sentencing hearing before the jury, the defense attempted to show the appellant's diminished capacity to appreciate the criminality of his conduct due to his intoxication and his jealous rage as a mitigating circumstance. (R. 1594.) Both Sharon Cooper,[3] the victim's widow, and Stanley Wilson, the victim's father, testified that they did not believe the appellant's story that the victim was having an affair. Both based their opinions on the victim's actions and their own personal knowledge of his whereabouts during the time when the appellant allegedly saw him with the woman. This testimony was offered to disprove the appellant's contention that he lacked the capacity to appreciate the criminality of his conduct because of a jealous rage. Again, the family members did not offer their opinions on the character of the appellant, the crime, or the appropriate punishment. Based on the foregoing, we find no plain error in the family's testimony concerning the credibility of the appellant's defense.

B
Next, the appellant argues that the State improperly attempted to prove his lack of remorse as a nonstatutory aggravating factor.
In its case-in-chief, the State asked Chad Roundtree if he had ever heard the appellant express remorse about killing Casey Wilson. The appellant objected to the question on the ground that this information was only proper in rebuttal. While the trial court rejected the appellant's argument that such testimony was only proper in rebuttal, it sustained the objection based on the form of the question. Although the State did elicit testimony about the appellant's description of the crime and his demeanor when he described the crime, it did not attempt to elicit any further testimony during its case-in-chief about whether the appellant had expressed or shown any remorse. However, the appellant elicited testimony from the mother of his child that he had expressed remorse, and had even cried about what he had done, during their telephone conversations. During closing arguments in both sentencing hearings, the prosecutor commented on the appellant's lack of remorse. In the *912 second sentencing hearing, the State elicited testimony about the appellant's lack of remorse during its case-in-chief. At no point did the appellant timely object to the comments or testimony as to his lack of remorse. Therefore, we will review this issue under the plain error rule. Rule 45, Ala. R. App. P.; Ex parte Land, supra.
The prosecutor's comments during closing arguments and testimony in the State's case-in-chief in the sentencing hearing before the trial court about the appellant's lack of remorse were not improper. They were offered to disprove the appellant's assertion that he was remorseful about the crime. As we stated above, there was, no plain error in admitting this testimony.
Furthermore, the State did not present evidence as to the appellant's lack of remorse as a nonstatutory aggravating circumstance. The State specifically said that it was relying on only two aggravating circumstancesÔÇöthat the murder was committed during the course of a robbery and that the murder was especially heinous, atrocious, or cruel when compared to other capital offenses. See Dobyne v. State, 672 So.2d 1319 (Ala.Cr.App.1994), on return to remand, 672 So.2d 1353 (Ala.Cr.App.1994), aff'd, 672 So.2d 1354 (Ala.1995), 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996). Furthermore, the trial court stated in the sentencing order that it found only those two aggravating circumstances. In fact, the trial court looked to the appellant's remorse, or lack thereof, to determine the existence of a non-statutory mitigating circumstance.
Finally, the appellant argues that the State's reliance on his lack of remorse forced him to rebut this testimony. As we noted above, the appellant first introduced evidence that he had displayed remorse in an attempt to establish remorse as a mitigating circumstance. Therefore, it was not improper for the state to rebut this testimony.
Based on the foregoing, we find no plain error in the State's presentation of evidence concerning the appellant's lack of remorse.

C
Next, the appellant argues that, during the sentencing hearing before the trial court, the State improperly asked Officer Renfroe to compare this murder to other capital crimes in the area in terms of heinousness, atrociousness, and cruelty. Renfroe testified that he had worked at the Huntsville Police Department for 26 years. During that time, he had investigated about 60 homicides, 20 of which were capital crimes. After defining the term "cruel" for Renfroe, the State asked how he would rank this murder in terms of cruelty in relation to other capital murders in the area. The trial court allowed Renfroe to give this testimony over the appellant's objection. The trial court also allowed Renfroe to rank the heinousness and atrociousness of the crime after the prosecutor defined those terms.
In determining whether a capital crime is especially heinous, atrocious, or cruel, the factfinder can compare the murder at issue with other capital crimes. The testimony of an experienced police officer who had investigated many capital crimes could be invaluable in making such a determination. Furthermore, the rank Renfroe assigned to Casey Wilson's murder on each scale was based on observations he had made in other cases. Therefore, the evidence constituted permissible opinion evidence. Although Renfroe was allowed to give his opinion as to the rank of the heinousness, atrociousness, and cruelty of Casey Wilson's murder, he did not testify as to the ultimate issue in the hearing, which was whether the State had established as an aggravating factor that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses. Furthermore, the defense asked Renfroe to compare this case to several other capital cases in the area. Based on Renfroe's testimony, the defense argued that there had been at least four capital murders in the area that were more heinous, atrocious, and cruel than this case. At trial, the appellant attempted to use *913 Officer's Renfroe's comparisons with previous capital crimes in the area to show that the murder was not especially heinous, atrocious or cruel. His present argument that such testimony was inadmissible is inconsistent with his position at trial. A person cannot take inconsistent positions at trial and on appeal. Therefore, we find no error in Renfroe's testimony.

D
Finally, the appellant argues that the cumulative effect of the alleged errors entitles him to a new sentencing procedure. Because we find no individual error, there is no cumulative error that entitles the appellant to relief.

V
The appellant's fifth contention is that the jury was misled as to the terms of the plea agreement with Chad Roundtree, a co-defendant. Roundtree entered into a plea agreement that required him to testify against the appellant. Roundtree testified at the appellant's trial that he would be sentenced to life in prison with the possibility of parole in exchange for his testimony. Subsequently, he was actually sentenced to serve 20 years in prison, a substantially lesser sentence. On December 19, 1997, we remanded this case for the trial court to determine, among other things, whether the terms of Roundtree's plea agreement had been misrepresented to the jury during Roundtree's testimony. Smith v. State, 756 So.2d 892 (Ala.Cr.App. 1997).
After a hearing, the trial court entered an order that read, in pertinent part:
"THE STATE DID NOT MISREPRESENT ROUNDTREE'S PLEA BARGAIN TO THE JURY

"After careful consideration of the testimony taken at the hearing, the depositions presented in this case, and other Court exhibits, this Court finds as follows:
"Findings of Fact

"The idea that Chad Roundtree should be treated with leniency originated with the victim's parents, Patricia and Stanley Wilson. They began to have these feelings after Roundtree testified at Smith's trial. However, they did not convey these feelings to the District Attorney's office until sometime after the conclusion of Smith's trial. The Wilsons expressed their feelings to the District Attorney when they first discussed whether Zuercher should be allowed to plead or go to trial. This occurred after Smith's trial.
"Ken Taylor, the District Attorney assigned to this case, was also certain that no conversation concerning lessening Roundtree's sentence occurred during Smith's trial. The first mention of treating Roundtree more leniently occurred after Smith's trial. Roy Miller, Roundtree's Attorney, and Roundtree himself both testified that the first they heard of lessening Roundtree's sentence from life to a sentence of 20 years was on May 31, 1996, the date that Roundtree was sentenced. At no time before May 31, 1996, did either of them receive any indication that Roundtree might receive a reduced sentence recommendation.
"Conclusions of Law

"The Alabama Court of Criminal Appeals has held, with regard to an alleged failure by the State to disclose deals with its witnesses:
"`In Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Supreme Court held that a jury was entitled to know of deals or consideration given in exchange for testimony. The Court held that jury knowledge of a deal between the State and a witness is relevant to an issue of the witness's credibility.' Id. Ex parte Bankhead, 585 So.2d 112, 121 (Ala.1991), aff'd, 577 So.2d 531 (1991), cert. denied, 502 U.S. 886, 112 S.Ct. *914 242, 116 L.Ed.2d 197 (1991). See also Kuenzel v. State, 577 So.2d 474 (Ala. Crim.App.1990); Kilpatrick v. State, 602 So.2d 465 (Ala.Crim.App.1992); McMillian v. State, 616 So.2d 933 (Ala.Crim.App.1993). Weaver v. State, 678 So.2d 260, 270 (Ala.Crim. App.1995), rev'd on other grounds, 678 So.2d 284 (Ala.), on remand to, Weaver v. State, 678 So.2d 292 (Ala.Crim. App.1996).
"`The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.' Hamilton v. State, 677 So.2d 1254, 1258 (Ala.Crim.App.1995), citing Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).
"Additionally, like claims under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), a finding of materiality of the evidence is required. A new trial is required only if the allegedly false testimony could have affected the judgment of the jury. Napue, 360 U.S. at 271, [79 S.Ct. 1173].
"In this case, the prosecutor correctly and truthfully disclosed the terms of Roundtree's plea agreement to the defense. Roundtree truthfully testified at Smith's trial that he would serve a life sentence in exchange for his testimony. The decision to give Roundtree more favorable treatment did not originate until Smith's trial was completed and he was sentenced. The jury had before it accurate information by which to judge the credibility of the witnesses.
". . . .
"For the reasons stated above, after conducting a hearing and considering all of the testimony and evidence submitted, this Court finds that no error occurred on either issue."
(Footnotes in the trial court's order omitted.)
We have carefully reviewed the record submitted by the trial court on return to remand, and we find no evidence that supports the appellant's argument. Thus, the trial court properly found that Roundtree testified truthfully about his plea agreement with the State, and this contention is without merit.

VI
The appellant's sixth contention is that the indictment against him was irreparably tainted because the grand jury foreperson was the father of an assistant district attorney for Madison County. We originally remanded this case for the trial court to determine whether Ed Starnes, the foreperson of the grand jury that indicted the appellant, had discussed the facts of this case with his son, Bill Starnes, an assistant district attorney, before the appellant was indicted and, if so, whether Ed Starnes should have been disqualified from serving on the grand jury that indicted the appellant. We also instructed the trial court to determine whether the fact that the grand jury foreperson was the father of an assistant district attorney for Madison County had any effect on the grand jury proceedings. Smith v. State, 756 So.2d 892 (Ala. Cr.App.1997). On remand, the trial conducted a thorough hearing at which both Bill Starnes and Ed Starnes testified. After the hearing, the trial court found as follows:
"SMITH'S INDICTMENT WAS NOT TAINTED

"Pursuant to the Alabama Court of Criminal Appeals' mandate, after consideration of the testimony of Bill Starnes, Madison County District Attorney, and his father, Ed Starnes, foreperson of the grand jury that returned Smith's indictment, this Court finds as follows:
"Findings of Fact

"Bill Starnes was not involved in the investigation, preparation, or presentation *915 of this case. Before and during the time the grand jury was convened, Bill Starnes had no knowledge of the facts of this case other than the information that was reported through the local media. He did not gain any knowledge or hear any conversations about this case through his employment with the Madison County District Attorney. Any involvement that Bill Starnes had in this case dealt solely with Smith's co-defendant, Jay Zuercher, and occurred months after Smith's trial, conviction, and sentence. Bill Starnes did not assist in the presentation of this or any case to the grand jury while his father was serving on the grand jury. Ed Starnes did not discuss this or any other case with his son before the return of the indictment. Bill Starnes was not aware that the grand jury on which his father was sitting was considering the Smith case until after the grand jury was dismissed, at which time he learned that the grand jury of which his father was foreperson had returned the indictment.
"Conclusions of Law

"Because Ed Starnes did not discuss this case with his son before the return of the indictment, Mr. Starnes was competent to serve as a member of the grand jury in this case. See Costello v. United States, 350 U.S. 359,76 S.Ct. 406, 100 L.Ed. 397 (1956); Cardwell v. State, 544 So.2d 987 (Ala.Crim.App.1988). This Court finds that Smith's indictment was not tainted."
We have carefully reviewed the transcript of the hearing and the trial court's written findings of fact and conclusions of law. The trial court's conclusion that Bill Starnes and Ed Starnes did not discuss this case while Ed Starnes was foreperson of the grand jury is supported by the record. There is also no indication in the record that Ed Starnes informed any of the other grand jurors that his son was an assistant prosecutor or that they knew this from some other source. There is no evidence that any member of the grand jury was influenced by the fact that Ed Starnes' son was an assistant prosecutor if they were aware of that fact. Therefore, we find no error in this regard.

VII
The appellant's seventh contention is that the State discriminated against women in the use of its peremptory challenges, in violation of J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). The appellant's twelfth contention is that the State discriminated against blacks in the use of its peremptory challenges, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Because he did not raise an objection at trial under either J.E.B. or Batson, we review these contentions under the plain error rule. Rule 45A, Ala. R. App. P.
"`"Under the `plain error' doctrine, as enunciated in Rule 45A, the Court of Criminal Appeals is required to search the record in a death penalty case and notice any error (ruling or omission) of the trial court and to take appropriate action, `whenever such error has or probably has adversely affected the substantial right of the [defendant],' in the same manner as if defendant's counsel had preserved and raised such error for appellate review." Ex parte Johnson, 507 So.2d 1351, 1356 (Ala.1986). For plain error to exist in the Batson context, the record must raise an inference that the state [or the defendant] engaged in "purposeful discrimination" in the exercise of its peremptory challenges. See Ex parte Watkins, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).'
"Guthrie v. State, 616 So.2d 913, 914 (Ala.Crim.App.1992) (second bracketed language added [in Rieber])."
Rieber v. State, 663 So.2d 985, 991 (Ala.Cr. App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 *916 L.Ed.2d 437 (1995). See also, Boyd v. State 715 So.2d 825 (Ala.Cr.App.1997).
"This court is bound by the certified record on appeal. The certified record provides no foundation for considering this issue....
"In many cases the appellate courts in this state have refused to find plain error grounded on Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), when no prima facie showing of discrimination appears on the face of the record. Ex parte Watkins, 509 So.2d 1074 (Ala.1987), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987); Jenkins v. State, 627 So.2d 1034 (Ala.Cr.App.1992), aff'd, 627 So.2d 1054 (Ala.1993); Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)."
Dobyne v. State, 672 So.2d 1319, 1327 (Ala. Cr.App.1994).
We have thoroughly reviewed the record submitted on appeal, and it does not raise any inference that the prosecution engaged in purposeful discrimination, against either blacks or women, in its use of peremptory challenges. Therefore, we find no plain error in this regard.

VIII
The appellant's eighth contention is that the State presented prejudicial, irrelevant evidence throughout his trial.

A
First, he contends that the State improperly introduced an unredacted audio tape recording of a conversation between the informants[4], the appellant, and Nick Mullins. He objects because, on the tape, Mullins says, "I've killed eight people." However, before playing the tape for the jury, the State specifically explained to the jury that Nick Mullins, not the appellant, made the statement about having killed eight people. Further, when the State subsequently referred to this statement, it did so in reference to Mullins and his character, and it never attempted to imply that the statement was attributable to the appellant.
The prosecution's later statements about the appellant's character were consistent with the State's theory of the case. It contended that the appellant's motive was to be perceived as a "hit man." This theory was supported by several of the appellant's own statements. Therefore, the prosecution's statements were not improper.
Finally, the appellant contends that statements on the tape about his carrying a .22 caliber pistol were irrelevant and improper. However, these statements were simply part of the appellant's conversation with one of the informants. Furthermore, there is no implication that it was illegal for the appellant to possess firearms or ammunition at that time. Therefore, we find no error in those statements.
The appellant also argues that other statements on the tape were irrelevant and were improperly used solely to malign him. However, the other statements were not incriminating and did not directly implicate the appellant in other crimes. Rather, the statements were merely incidental statements made while the appellant discussed the present offense with the informants and Mullins. Finally, as set forth more fully in Part XI of this opinion, the trial court thoroughly instructed the jury about what weight, if any, it could choose to give to out-of-court statements, including taped statements. Therefore, we find no error in the admission of the tape.

B
The appellant also argues that the State improperly introduced evidence that *917 implied that he had been involved in another offense, i.e., credit card fraud. He objects to the following exchange that occurred during an officer's interview with Chad Roundtree:
"Q: You remember the store that they've got the videotape of y'all using the credit card?
"A: Yeah.
"Q: You don't remember using a credit card down at the store? ... Remember when a couple of weeks ago you got arrested on a credit card, that store that y'all were in?
"A: Yeah."
Because the appellant did not make this objection at trial, we must review it under the plain error rule. Rule 45A, Ala. R. App. P.
This statement was made in a taperecording that was played for the jury. The officer referred only to Roundtree's being arrested for an offense related to a credit card. He did not say that the appellant had been arrested or even involved in the alleged crime involving a credit card. Also, the statement was isolated and was only made once. The appellant presented evidence that he had not been in trouble with the law before, except for a misdemeanor arrest in 1990 for possession of alcohol by a minor. In fact, the trial court found this to be a mitigating circumstance. Also, there is no further mention of the alleged offense other than the single incident on the tape. Finally, as set forth in Part XI of this opinion, the trial court thoroughly instructed the jury about what weight, if any, to give to out-of-court statements, including tape-recorded statements. The appellant has not shown that the comment has or probably has adversely affected his substantial rights. Rule 45A, Ala. R. App. P.

C
The appellant argues that the testimony offered by the victim's family during the guilt phase of his trial was inadmissible.
During the State's case in chief, Sharon Cooper[5], the victim's widow, testified about how she had met the victim, how long they had been married, his educational background, his height and weight, and the last time she saw him. She was then asked to identify the victim from a photograph. This type of evidence has been held to be admissible during the guilt phase of a capital case because "[i]t is the jury's responsibility to make an individualized determination of sentence on the basis of the character of the individual [defendant] and the circumstances of the crime." Rutledge v. State, 523 So.2d 1087, 1091 (Ala.Cr.App.1987), reversed on other grounds, 523 So.2d 1118 (Ala.1988), on remand, 523 So.2d 1121 (Ala.Cr.App.1988). Later, during the State's rebuttal, the appellant offered testimony by Cooper and Patricia Wilson, the victim's mother. Cooper testified about the victim's work ethic and college background. Patricia Wilson testified about the last time she saw her son alive.
"Recently, this Court examined the issue of victim impact evidence in Ex parte Rieber, 663 So.2d 999 (Ala.1995). In Rieber, we acknowledged that testimony regarding a murder victim's children was not relevant to the issue of the accused's guilt or innocence and was, thus, inadmissible during the guilt phase of trial; we noted, however, that `a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.' 663 So.2d at 1005. After thoroughly reviewing the record of this present case, we conclude that the limited testimony regarding Ms. Brown's infant son and the impact of Ms. Brown's death on her family, and the prosecution's limited references to such evidence, did not operate to deny Land a fair trial or to prejudice his *918 substantial rights. Thus, we find no reversible error as to this issue."
Ex parte Land, 678 So.2d 224, 236 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996).
In Ex parte Rieber, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995), the Alabama Supreme Court held as follows:
"We agree with Rieber that Mr. Craig's testimony concerning Ms. Craig's children, their ages, and the status of their custody after the murder was not relevant with respect to the question of his guilt or innocence and, therefore, that it was inadmissible in the guilt phase of the trial. The only issue before the jury during the guilt phase of the trial was whether Rieber had robbed and killed Ms. Craig. However, in Ex parte Crymes, 630 So.2d 125 (Ala.1993), a plurality of this Court held in a capital murder case in which the defendant was sentenced to life-imprisonment without parole that a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant. See, also, Giles v. State, 632 So.2d 568 (Ala. Crim.App.1992), aff'd, 632 So.2d 577 (Ala.1993), cert. denied, 512 U.S. 1213, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994); Ex parte Parker, 610 So.2d 1181 (Ala. 1992), cert. denied, 509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993); Lawhorn v. State, [581 So.2d 1159 (Ala. Cr.App.1990)]; Hooks v. State, 534 So.2d 329 (Ala.Crim.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989); and Ex parte Whisenhant, [555 So.2d 235 (Ala.1989)], applying a harmless error analysis in death penalty cases. Our review of the record indicates that Rieber's attorneys did not object to Mr. Craig's brief references to Ms. Craig's children or ask him any questions on cross-examination. The trial court clearly instructed the jury that it had to determine, based on all of the evidence, whether Rieber had robbed and killed Ms. Craig. The jury was instructed that it could not find Rieber guilty unless the prosecutor had established his guilt beyond a reasonable doubt. The jury was also instructed not to let sympathy or prejudice affect its verdict. We caution prosecutors that the introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law. However, after examining the record in its entirety, we conclude that the aforementioned portions of Mr. Craig's testimony, although they should not have been permitted, did not operate to deny Rieber a fair trial. It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that Rieber did not receive a fair trial simply because the jurors were told what they probably had already suspectedÔÇöthat Ms. Craig was not a `human island,' but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter's opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991))."
663 So.2d at 1005-06 (emphasis supplied).
As in Land and Rieber, we find no evidence that the challenged testimony affected the outcome of the trial or otherwise prejudiced a substantial right of the defendant. Ex parte Rieber, 663 So.2d at 1005; Ex parte Crymes, 630 So.2d 125 (Ala.1993). And, like the defendant in Ex parte Rieber, the appellant did not object to the testimony he now challenges. Thus, we *919 must analyze the appellant's argument under the plain error rule. See Rule 45A, Ala. R. App. P. Williams v. State, 601 So.2d 1062, 1066 (Ala.Cr.App.1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992). See also Brooks v. State, 695 So.2d 176 (Ala.Cr.App.1996), aff'd, 695 So.2d 184 (Ala.), cert. denied, 522 U.S. 893, 118 S.Ct. 233, 139 L.Ed.2d 164 (1997). We presume that the testimony did not improperly affect the jury's decision because the jury recommended a sentence of life imprisonment without the possibility of parole. Crymes, supra. We also presume that the trial court ignored any improper evidence in reaching its decision regarding sentencing. Sockwell, supra. See also Lightbourne v. Dugger, 829 F.2d 1012 (11th Cir. 1987), cert. denied, 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988); Whisenhant v. State, 555 So.2d 219, 229 (Ala.Crim.App. 1988), aff'd, 555 So.2d 235 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990). Because there is no indication that the victim impact evidence affected the outcome of the trial or otherwise prejudiced the appellant, this argument is without merit.

IX
The appellant's ninth contention is that Officer Renfroe was allowed, in effect, to present a closing argument from the witness stand and to usurp the jurors' factfinding function when he described what the jurors were seeing on a videotape of the crime. The videotape simultaneously depicted four views taken from different angles in the store. In each view, different things were occurring. Officer Renfroe, who had seen the actual crime scene and who had watched the tape at least 40 times, gave a preview of what the videotape showed and then highlighted portions of the videotape as it was played for the jury. After objection by the defense and instruction by the trial court, Renfroe did not refer to the people on the videotape using their actual names. Although Renfroe was not present during the crime, he was familiar with the crime scene and the videotape. The jury, on the other hand, had not seen the actual crime scene. Thus, Renfroe's testimony was relevant to put the scenes depicted on the videotape in perspective as they related to the store. Although Renfroe commented on what the videotape showed, we do not find that his comments constituted a closing argument or that he usurped the jury's factfinding function. Based on his observation of the actual crime scene and his investigation of the crime, he properly described what the videotape depicted. Furthermore, Renfroe's testimony was consistent with the appellant's confession and his subsequent trial testimony. Finally, any error in Renfroe's testimony was harmless based on the remaining overwhelming evidence against the appellant, including the appellant's confession and the testimony of Roundtree, Monique Ferguson Ickes, and Owen Ickes. Therefore, we find that Renfroe's testimony did not deprive the appellant of a fair trial.

X
The appellant's tenth contention is that the trial court improperly rejected the jury's recommendation of a sentence of life imprisonment without the possibility of parole and sentenced him to death. First, he contends that the trial court refused "to accept the very concept of mitigation." His argument is essentially that the trial court improperly rejected some mitigating evidence and that it improperly found that the aggravating circumstances outweighed the mitigating circumstances. The record reflects that, as Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and its progeny require, the trial court allowed the appellant to present all of the mitigating evidence he wanted to present. The sentencing order reflects that the trial court fully considered all of that evidence in imposing the sentence. "While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority." Ex *920 parte Slaton, 680 So.2d at 924. See also Carroll v. State, 599 So.2d 1253 (Ala.Cr. App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994); Ex parte Harrell, 470 So.2d 1309 (Ala.1985), cert. denied, 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 347 (1988). The trial court specifically noted in its sentencing order that it had considered all of the mitigation evidence offered by the appellant. In fact, it found the existence of one statutory mitigating circumstance and 16 nonstatutory mitigating circumstances. In addition, it also explained its reasons for finding that some of the circumstances were mitigating and some were not. The trial court clearly considered all the mitigation evidence the appellant offered, and it properly determined what weight it would assign to that evidence in weighing it against the aggravating circumstances. See Carroll, supra; Ex parte Harrell, supra. Moreover, the trial court considered the jury's recommended sentence in weighing the mitigating circumstances against the aggravating circumstances. Therefore, the appellant's claim that the trial court refused to accept the concept of mitigation is not supported by the record.
Second, the appellant contends that Alabama's death penalty statute is unconstitutional because it does not specify what weight the trial court must afford a jury's recommendation. Therefore, he argues that trial judges deprive defendants of equal protection of the law by employing different processes in determining what weight, if any, to give a jury recommendation as to sentencing. This claim was recently addressed and rejected by the United States Supreme Court in Harris v. Alabama, 513 U.S. 504, 511-15, 115 S.Ct. 1031, 1035-37, 130 L.Ed.2d 1004 (1995), in which that Court held as follows:
"Consistent with established constitutional law, Alabama has chosen to guide the sentencing decision by requiring the jury and judge to weigh aggravating and mitigating circumstances. Harris does not challenge this legislative choice. And she objects to neither the vesting of sentencing authority in the judge nor the requirement that the advisory verdict be considered in the process. What she seeks instead is a constitutional mandate as to how that verdict should be considered; relying on Florida's standard, she suggests that the judge must give `great weight' to the jury's advice.
"We have rejected the notion that `a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required.' Franklin v. Lynaugh, 487 U.S. 164, 179, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155 (1988). Equally settled is the corollary that the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer. See, e.g., Blystone v. Pennsylvania, 494 U.S. 299, 306-307, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255 (1990); Eddings v. Oklahoma, 455 U.S. 104, 113-115, 102 S.Ct. 869, 876-877, 71 L.Ed.2d 1 (1982); Proffitt [v. Florida], 428 U.S. [242] at 257-258, 96 S.Ct. [2960] at 2969, 49 L.Ed.2d 913 [(1976)] (joint opinion of Stewart, Powell, and STEVENS, JJ.). To require that `great weight' be given to the jury recommendation here, one of the criteria to be considered by the sentencer, would offend these established principles and place within constitutional ambit micromanagement tasks that properly rest within the State's discretion to administer its criminal justice system. We therefore hold that the Eighth Amendment does not require the State to define the weight the sentencing judge must accord to an advisory jury verdict.
". . . .
"Harris draws our attention to apparent disparities in the weight given to jury verdicts in different cases in Alabama. For example, the trial judge here did not specify his reason for rejecting the jury's advice but in another case wrote that he accorded `great *921 weight' to the recommendation, State v. Coral, No. CC-88-741 (Montgomery Cty., June 26, 1992), Alabama Sentencing Orders, p. 72 (lodged with the Clerk of this Court). In rejecting the jury verdict, other judges have commented variously that there was a `reasonable basis' to do so, State v. Parker, No. CC-88-105 (Colbert Cty., Dec. 3, 1991) Alabama Sentencing Orders, p. 408, that the verdict was `unquestionably a bizarre result,' Ex parte Hays, 518 So.2d 768, 777 (Ala.1986), or that `if this were not a proper case for the death penalty to be imposed, a proper case could scarcely be imagined,' State v. Frazier, No. CC-85-3291 (Mobile Cty., July 31, 1990) Alabama Sentencing Orders, p. 139. Juxtaposing these statements, Harris argues that the Alabama statute permits judges to reject arbitrarily the advisory verdict, thereby abusing their sentencing discretion.
"But these statements do not indicate that the judges have divergent understandings of the statutory requirement that the jury verdicts be considered; they simply illustrate how different judges have `considered' the jury's advice. There is no reason to expect that the advisory verdicts will be treated uniformly in every case. The Alabama statute provides that the weighing process `shall not be defined to mean a mere tallying of aggravating and mitigating circumstances for the purpose of numerical comparison,' Ala.Code  13A-5-48 (1994), which is no less than what the Constitution requires, see Proffitt, 428 U.S., at 258, 96 S.Ct., at 2969 (joint opinion). The disparate treatment of jury verdicts simply reflects the fact that, in the subjective weighing process, the emphasis given to each decisional criterion must of necessity vary in order to account for the particular circumstances of each case. See Eddings v. Oklahoma, 455 U.S. 104, 112, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982) (`[A] consistency produced by ignoring individual differences is a false consistency')."

XI
The appellant's eleventh contention is that the trial court's instructions during the guilt phase of his trial were improper. He did not make a timely objection during or after the trial court's instructions to any of the challenged statements. Therefore, we must review the trial court's instructions under the plain error rule. Rule 45, Ala. R. App. P.
A trial court has broad discretion when formulating its jury instructions. Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court's instructions, "`the court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.'" Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App. 1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App.1992).

A
First, the appellant argues that the trial court's instructions lessened the State's burden of proof in two ways.
According to the appellant, the trial court's statement, "[B]efore you can reach a verdict, before you can make a true declaration of the facts of this case in controversy, you must decide what actually happened on the dates and at the places you have heard testimony about," relieved the State of its burden of proving each element of the crimes charged. We disagree. The trial court had already instructed the jury that the State carried the burden of proof in this case and that the appellant could rely solely on the State's failure to prove its case. Furthermore, the instruction complained of was given when the trial court was defining the jury's role in the case. The trial court explained that the jury, not the judge, would determine the facts in the case. The trial court also explained that the *922 judge's role was to direct the trial process and to instruct the jury on the applicable law. Therefore, we find no plain error in the trial court's statement.
The appellant also argues that the trial court's instruction on reasonable doubt violated the principles of Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). After reviewing the instruction on reasonable doubt, we conclude that it does not violate the principles set forth in Cage. Although the trial court did refer to a reasonable doubt as an "actual doubt," it did not state that the doubt must be "grave" or "substantial," as the faulty charge in Cage instructed. See Cage, 498 U.S. at 40, 111 S.Ct. at 328 (holding that the terms "grave" and "substantial" suggest a higher degree of doubt than that actually required to acquit). Furthermore, the trial court's instruction that the doubt could not be "fanciful," "vague," "speculative," "arbitrary," or "merely possible" follows the language of the Alabama Pattern Jury Instruction: Criminal on a reasonable doubt charge. The fact that the trial court followed an accepted pattern jury instruction weighs heavily against any finding of error. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App. 1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994); Dill v. State, 600 So.2d 343 (Ala.Cr.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). Based on the foregoing, there is no plain error in the trial court's instruction on reasonable doubt.

B
Next, the appellant argues that the trial court improperly charged the jury on robbery and complicity. The appellant argues that the trial court's charge on accomplice liability would allow the jury to find him guilty of capital murder even if he had no intent to commit a robbery.
A review of the trial court's entire instruction on complicity refutes the appellant's argument. The trial court specifically instructed the jury as follows:
"A person is legally accountable for the behavior of another constituting a criminal offense if with the intent to promote or assist in the commission of the offense he procures, induces, or causes such other person to commit the offense or he aids or abets such other person in committing the offense."
(R. 1437) (emphasis added). Therefore, the trial court's instruction would not have allowed the jury to convict the appellant unless it found that he intended to promote or assist in the commission of the robbery. Furthermore, the trial court did not instruct the jury that the appellant's mere presence at the scene of the robbery, without more, would constitute aiding and abetting. The trial court stated that "in order for a person's presence at the scene of a crime to amount to aiding and abetting, that person must be present in such a way that it would sanction or encourage the other person to actually do the criminal act." (R. 1439) (emphasis added). There was no error in the trial court's instructions on complicity.

C
Next, the appellant argues that the trial court erred in telling the jury that the court had already found the appellant's statement to be admissible because doing so gave the statement an "imprimatur of reliability" and prevented the jury from looking at the voluntariness of the statement. While charging the jury on out-of-court statements, the trial court stated:
"All right. There has been some testimony aboutÔÇöand, indeed, there is in evidence a tape recording of statements made by this defendant out of court and prior to trial. There is also evidence before you a, tape recording of a statement or statements made out of court by an accused codefendant and accomplice, Chad RoundtreeÔÇöPhillip Chad Roundtree, *923 which you will have with you in the jury room.
"With regard to that evidence, I will tell you that you must determine the weight or the credibility, if any, you choose to give to those pieces of evidence, those out-of-court statements. A jury may disregard an out-of-court statement, alleged confession, or incriminating statement which it considers unworthy of belief. Now, while the Court determines the admissibility of out-of-court statements, you, the jury, determine the credibility or believability of and the weight that should be assigned to them. And you may disregard an alleged out-of-court statement attributed to this defendant which you find unworthy of belief or in which you entertain a reasonable doubt as to the truthfulness.
"As you assess these out-of-court statements, you may consider the time and the place of the alleged statements, the persons who were present when the statements were obtained, and the surroundings in which the defendant and his co-defendant accomplice, Chad Roundtree, found themselves when the statements were made.
"Now, there is no rule of law that requires you, the jury, to give equal weight or credence to every part of an alleged out-of-court statement by a defendant or admission or confession by a co-defendant. All the parties of these alleged out-of-court statements must be considered by you in light of the surrounding circumstances in which the people speaking found themselves and the motives which may have induced their statements, and the consistency of those statements with the other evidence before you that you determine to be credible and believable."
(R. 1420-22). The trial court's statement that it had already determined the admissibility of out-of-court statements imparted no "imprimatur of reliability." The trial court had already informed the jury that it could "disregard an out-of-court statement, alleged confession, or incriminating statement which it consider[ed] unworthy of belief." (R. 1421). Furthermore, the instruction in this case is vastly different from the trial court's instruction in Bush v. State, 523 So.2d 538 (Ala.Cr.App.1988). The trial court did not instruct the jury that the determination of voluntariness rested solely with the court. Rather, the trial court's instruction incorporated the elements of voluntariness in the factors that the jury could consider in judging the credibility of the statements. There was no plain error in the trial court's instructions on evaluating the out-of-court statements.

D
Next, the appellant argues that the trial court erred because it did not define circumstantial evidence in its instructions. The trial court informed the jury that circumstantial evidence was not direct evidence. The trial court asked members of the jury to raise their hands if they did not understand the term "circumstantial evidence." No one responded. The court instructed the jury that, when relying on circumstantial evidence, "the chain of circumstances must be so complete and of such character as to convince you that the defendant is guilty beyond a reasonable doubt." (R. 1413) (emphasis added). Furthermore, the appellant did not make a timely objection to the trial court's instruction on circumstantial evidence. While the absence of an objection will not preclude review in this case, it weighs against any claim of prejudice. Kuenzel v. State, 577 So.2d 474, 523 (Ala. Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). After reviewing the trial court's charge on circumstantial evidence in its entirety, we find that it sufficiently explained to the jury the concept of circumstantial evidence and the manner in which it should be weighed with other evidence.

E
The appellant also argues that the trial court improperly instructed the jury on *924 how to consider the evidence. The trial court instructed the jury as follows:
"Now, as you review the evidence before you, both the testimony that came from the witness stand from the various witnesses, and the exhibits that have been admitted, if it appears to you that there are conflicts in that evidence, then that may or it may not be significant. That is a matter for you to determine. I would simply remind you it is not unusual for witnesses to contradict one another on insignificant, immaterial matters. Frankly, most of us do not see or hear things in quite the same way. Furthermore, with the passage of time, our memories may become less precise. Indeed, the testimony of a witness may fail to conform to the true facts of an event as that event actually occurred at some point in the past for any number of reasons, including at least the reasons I am going to suggest to you. First, perhaps the witness did not accurately see or hear that about which he or she testified. Or, secondly, perhaps the witness's present recollection of the past event now is faulty as a result of the passage of time and intervening events in the life of that witness. Or perhaps the witness did not express him or herself clearly here in open court in an unfamiliar and sometimes stressful environment in front of a roomful of strangers. Or, fourthly, perhaps the witness was biased or prejudiced as a result of some connection to either side to this case. Or, finally, perhaps the witness was intentionally telling a falsehood. Those are just some of the things which might affect the testimony that you have seen and heard delivered. Unfortunately, there is no formula that I can give to you to use in evaluating this evidence or in reconciling any conflicts which may or may not appear to you. Nevertheless, I can tell you a few things. First, attempt to reconcile any conflict in the testimony of the various witnesses and the exhibits if you can reasonably do so. On the other hand, if, in your opinion, there is an irreconcilable conflict in the evidence, a conflict that just cannot be reasonably resolved, then you ought to take only that testimony and evidence you think worthy of belief and give it such weight as you think it's entitled to receive. In doing that, if you believe a witness has been contradicted, discredited, or impeached by the testimony of another witness, you find more credible or by some other piece of evidence, then you may consider the fact of such contradiction in determining the credibility or believability of that contradicted witness and the weight you will give to the testimony of that witness.
"I would caution you, however, mere contradiction of a witness on an insignificant, immaterial point or points would not authorize you to disregard the entire testimony of that witness. Rather, you may disregard the entire testimony of a witness only when you believe the witness has willfully and intentionally testified falsely to any material and significant fact or facts in the case. Even then, you are not required by the law to disregard the entire testimony of such a witness, but you may do so in your discretion if you choose. Furthermore, in assessing credibility and in weighing the evidence, you may take into account such common sense things as the appearance and demeanor of each witness while on the stand. The manner in which each witness testified and the ability of the witness to relate to you the things he or she claims to have seen, heard, done, smell, tasted, or whatever. You may consider a witness's frankness or lack of frankness. You may consider the opportunity which the witness has to clearly see or hear the matters about which that witness testified. You may also consider any bias or prejudice which a witness may have shown while testifying or which the witness may harbor as a result of friendship, kinship, or any other relationship to either side of this case. You may consider any interest which a witness may have in the outcome of the case.

*925 "In that regard I note that this defendant, Ronald Bert Smith, Jr., testified in his own behalf, as he has perfect right to do. You cannot capriciously disregard his testimony any more than that of any other witness. The law says you must take the defendant's testimony and consider it along with all of the other evidence in the case. But while you are considering the defendant's testimony, you also may take into account the fact that he is the defendant, that he is interested in the outcome of this case, and that any punishment meted out on a conviction of any crime charged or arising from the indictment by an operation of law must be borne by him.
"In short, what I'm trying to tell you about recollection of the conflicts in the evidence is not only that you may, but that you should use your good common sense and your everyday knowledge of people, places, and affairs in evaluating the evidence and assessing the credibility of the witnesses and in weighing their testimony and the sufficiency of the State's approval."
(R. 1415-19.)
First, the appellant argues that the trial court erred when it instructed the jury as follows: "[Y]ou may disregard the entire testimony of a witness only when you believe the witness has willfully and intentionally testified falsely to any material and significant fact or facts in the case." (R. 1417.) According to the appellant, this instruction prevented the jury from disregarding a witness's entire testimony if the jury found it to be incredible or if the jury found the witness to be biased.
When viewed in the context of the trial court's entire oral charge regarding the weight and the credibility of evidence, this instruction was not improper. Furthermore, the appellant did not object to the trial court's instruction, nor did he request a charge that a witness's testimony could be disregarded altogether based on bias and incredibility. This weighs against the appellant's claim of prejudice. Kuenzel, supra. Based on the foregoing, there is no plain error in the trial court's charge.
The appellant also argues that the trial court erred when it gave the following instruction regarding the appellant's testimony:
"You cannot capriciously disregard his testimony any more than that of any other witness. The law says you must take the defendant's testimony and consider it along with all of the other evidence in the case. But while you are considering the defendant's testimony, you also may take into account the fact that he is the defendant, that he is interested in the outcome of this case, and that any punishment meted out on a conviction of any crime charged or arising from the indictment by an operation of law must be borne by him."
Viewing this instruction in the context of the entire oral charge, we conclude that the trial court did not err in giving this instruction. See Hart v. State, 612 So.2d 520, 529-30 (Ala.Cr.App.), aff'd, 612 So.2d 536 (Ala.1992), cert. denied, 509 U.S. 942, 114 S.Ct. 19, 125 L.Ed.2d 770 (1993).

F
The appellant also contends that certain other jury instructions were improper.
First, the appellant argues that the trial court erred when it stated, after it had informed the jury of the proper process for presenting questions that might arise during its deliberations, "hopefully there will be no questions." According to the appellant, the judge was discouraging questions from the jury. Actually, the statement merely expressed the trial court's hope that its previous charges had adequately explained the applicable law and that no further instructions would be necessary. There was no plain error in this statement.
Next, the appellant argues that the trial court's instruction on unanimity may have left the jury with the impression that it did not have the option of not reaching a verdict. *926 The trial court merely instructed the jury that any verdict it reached must be unanimous. There was no error in this instruction.
Finally, the appellant argues that the trial court's instructions on the use of juror notes may have precluded the resolution of questions raised by allegedly confusing and misleading charges. The absence of a timely objection to this instruction weighs against the appellant's claim of possible prejudice. Kuenzel, supra. Furthermore, the decision to allow jurors to take notes and use them in their deliberations is discretionary with the trial court. Poole v. State, 650 So.2d 541 (Ala. Cr.App.1994). The trial court's instruction that the jurors should not share their notes with other jurors or use the notes as authority in their deliberations does not rise to the level of plain error.

XII
See Part VII of this opinion for the discussion of the appellant's twelfth contention.

XIII
The appellant's thirteenth contention is that the prosecution made improper statements to the jury. The trial court repeatedly instructed the jury that statements made by the attorneys were not evidence and that it was required to base its decision upon the evidence presented during the proceedings. The trial court also instructed the jury not to base its decision on passion, prejudice, or any other arbitrary factor. We presume that the jury followed the instructions given by the trial court. Taylor v. State, 666 So.2d 36 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). In addition, we evaluate the comments made by the prosecutor in the context of the entire proceeding. Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). "`In judging a prosecutor's closing argument, the standard is whether the argument so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).
"In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App. 1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App. 1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982)."
Bankhead v. State, 585 So.2d 97, 106 (Ala. Cr.App.1989), aff'd in relevant part, 585 So.2d 112, 127 (Ala.1991), opinion after remand, 625 So.2d 1141 (Ala.Cr.App.1992), reversed on other grounds, 625 So.2d 1146 (Ala.1993).
"`During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.' Rutledge v. State, 523 So.2d 1087, 1100 (Ala. Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). `In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,' *927 Hooks v. State, 534 So.2d 329, 354 (Ala. Cr.App.1987), aff'd, 534 So.2d 371 (Ala. 1989), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr. App.1990), aff'd, 590 So.2d 369 (Ala. 1991). `In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.' Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). `To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr. App.1985) (citations omitted)."
Coral v. State, 628 So.2d 954, 985 (Ala.Cr. App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994).

A
The appellant first argues that the prosecutor's statement during his closing argument that "the mere presence of a gun establishes intent" to kill improperly misled the jury as to what was necessary to prove intent. Our review of the record reflects that the appellant did not make a timely objection to this statement. Therefore, we review this issue under the plain error rule. Rule 45A, Ala. R. App. P. The trial court properly instructed the jury on intent and repeatedly advised the jurors that arguments of counsel were not evidence or statements of the applicable law. Therefore, there is no plain error in this regard.
He next argues that the prosecutor misled the jurors by stating that they could convict the appellant of capital murder if they found that he tried to "take something of value from the Circle C." He asserts that that statement was inconsistent with the indictment. However, the objection was premature because, immediately after he made the statement, the prosecutor specified the items identified in the indictment. Moreover, it appears from the record that the prosecutor was not trying to mislead the jury but was simply stating the statutory definition of the offense of robbery.
The appellant also argues that the prosecutor attempted to confuse the jury about the applicable law by asking him on cross-examination whether he believed that he was guilty of manslaughter or murder. Because the appellant did not object to this line of questioning at trial, our review of this issue is governed by the plain error rule. Rule 45A, Ala. R. App. P. Although the appellant characterizes the State's cross-examination as an attempt by the prosecution to force a nonlawyer to give impermissible testimony about his conclusions of law, we do not agree. After his arrest, the appellant made a statement to the police in which he claimed that he intended to rob the Circle C store. He testified at trial, however, that he actually killed the victim because of a "jealous rage." He explained that, after he killed the victim, he made the incident look like a robbery because he did not want his family to think that he had committed the murder because of a woman. Therefore, the State's cross-examination of the appellant was an attempt to impeach him.
Furthermore, the appellant placed matters such as the differences between murder and manslaughter in issue when he changed his theory of the case from that of a murder committed during a robbery to that of a heat-of-passion manslaughter. The State has a right to sift through those matters bearing on the appellant's conduct and the circumstances that might bear on his credibility.
"McElroy's Alabama Evidence states the following about cross-examination:
"`The cross-examining party has the absolute right on cross-examination, not only to inquire as to matters relevant to the issues ... but also to *928 inquire into the conduct and circumstances of the witnesses which have measurable bearing upon his credibility. This right to a party to have thorough and sifting cross-examination is provided by statute.'
"C. Gamble, McElroy's Alabama Evidence,  136.01 (4th ed. 1991)."
Hampton v. State, 681 So.2d 273, 274-75 (Ala.Cr.App.1996). See also  12-21-137, Ala. Code 1975. There is no plain error in this regard.

B
The appellant argues that the State improperly engaged in name calling and otherwise tried to disparage him before the jury. Specifically, he complains that the prosecution referred to him as a "liar," a "big time up east killer," a member of the mafia, a "nobody," and a "college drop-out flunk-out ... borderline alcoholic." The record reflects that when the appellant objected to the State's reference to him as a "liar," the trial court immediately charged the jury that the State's argument was improper. The prosecutor apologized to the court, stating, "I went too far." The trial court then instructed the jurors "not to take that fact into consideration or that assertion into consideration in arriving at a verdict." (R. 1373-74). The trial court's immediate curative instruction concerning the prosecution's comment creates a prima facie presumption against error. Holliday v. State, 641 So.2d 325, 329 (Ala.Cr.App.1994); Mathis v. State, 414 So.2d 151 (Ala.Cr. App.1982).
The remaining comments were permissible references based on the evidence presented in this case. Gray v. State, 568 So.2d 381 (Ala.Cr.App.1990); Ward v. State, 440 So.2d 1227 (Ala.Cr.App. 1983). The record shows that the State learned of the appellant's involvement in this case after being contacted by Monique Ferguson. The appellant bragged to Ferguson about the murder of the Circle C clerk, and Ferguson informed investigators about the appellant's claims. He also bragged to Owen Ickes, Ferguson's then-boyfriend, now her husband, about the crime. On December 2, 1994, while Ickes wore a body transmitter and Ferguson concealed a small cassette recorder in her purse, they discussed the murder of Casey Wilson with the appellant and Nick Mullins. On this tape, which was played before the jury, the appellant again brags about murdering the victim. The unflattering names about which the appellant now complains were reasonable references based on the evidence, particularly the December 2, 1994, taped statement to Ferguson and Ickes, his confession to the police, and the differences between his statement to police and his testimony at trial. Gray, supra; Ward, supra.

C
The appellant next argues that, during the guilt phase of his trial, the State improperly asked Investigator Payne and Chad Roundtree improper and prejudicial questions about his remorse. He did not object to the testimony during the trial. Therefore, we review this issue under the plain error rule. Rule 45A, Ala. R. App. P.
During cross-examination of Investigator Payne during the guilt phase of the appellant's trial, the defense asked Payne a lengthy series of questions designed to elicit testimony that the appellant had provided all the assistance he could to the police in their investigation of the case. Defense counsel even asked Payne if "there was anything [the appellant] could have done more to help you in his investigation of him," and "was he more cooperative" than some other defendants. Thereafter, the prosecutor asked Investigator Payne, without objection, whether the appellant showed remorse, and Payne answered "never." (R. 821).
The purpose of defense counsel's questions to Payne about the assistance the appellant provided to the police investigation was to establish as a nonstatutory mitigating circumstance that the appellant *929 was contrite and was remorseful for his crime and that he cooperated with the police in their investigation of Casey Wilson's murder. However, by trying to prove his cooperation and, in a sense, his alleged remorse, for Casey Wilson's death, the appellant opened the door for the State to present rebuttal evidence. That rebuttal was proper under the circumstances.
"Under the `reply in kind' doctrine, where counsel for one party permits counsel for the opposing party to make impermissible remarks to the jury without interposing an objection, the law implicitly reserves to the non-objecting party the right to reply in kind, although his argument could be equally as impermissible as the other's argument. Ex parte Rutledge, 482 So.2d 1262 (Ala. 1984)."
Jackson v. State, 629 So.2d 748, 753 (Ala. Cr.App.1993).
"Where one party introduces a subject into evidence, that party should not be heard to complain when the other party introduces similar evidence in rebuttal. Cross v. State, 147 Ala. 125, 130, 41 So. 875, 876 (1906) (`It is not reversible error to permit immaterial evidence to be rebutted by immaterial evidence'). See also Heard v. Burton-Boyd Mercantile Co., 202 Ala. 218, 219, 80 So. 40, 41 (1918). A party has `the right to rebut evidence offered against him, be it relevant or irrelevant.' Smothers v. State, 39 Ala.App. 292, 295, 98 So.2d 66, 68 (1957)."
Childers v. State, 607 So.2d 350, 352 (Ala. Cr.App.1992), reversed on other grounds, 640 So.2d 16 (Ala.1994).
The State also asked Roundtree whether he believed that the appellant was remorseful about the murder. However, defense counsel objected to this question as being based on the appellant's mental state, and the question was withdrawn. The State then asked Roundtree if the appellant showed any remorse after the shooting and he replied that there was no remorse. Because this issue was never raised properly before the trial court, we review it under the plain error rule. Rule 45A, Ala. R. App. P. In light of the overwhelming evidence presented by the State, we find no plain error regarding either the testimony of Investigator Payne or Roundtree concerning the appellant's lack of remorse.

D
The appellant argues that the trial court improperly allowed the prosecutors to state their personal opinions and to vouch for witnesses in arguing to the jury. He first claims that the prosecutor's statement, "It is a rare occasion that you have as much evidence to prove a case of this nature as we have here," (R. 1342), is tantamount to "vouching" for the credibility of his witnesses. He does not, however, state how the comment constitutes "vouching." Rather, he makes a bare assertion that it does. We believe that the prosecutor's comment is simply a permissible comment on the evidence: the State introduced a statement the appellant made early in its investigation and a tape recording in which the appellant again admitted he murdered Casey Wilson. It also introduced the testimony of Ursula Stehle and Chad Roundtree, the only one of the appellant's co-defendants willing to testify at his trial.
The appellant also argues that the trial court erred by allowing the State, in its rebuttal during closing arguments, to comment on the fact that the Governor of Alabama had offered a $10,000 reward to anyone offering information leading to the arrest of the killer. However, this evidence was already before the jury. During the trial, defense counsel repeatedly implied that the informants went to the police simply to obtain the rewards offered by various officials. Thus, the prosecutor's comment was properly made to rebut defense counsel's implications about the informants and the rewards.

*930 E
The appellant argues that the prosecution misstated the facts and relied on facts not in evidence. The appellant cites as examples the State's comments that the victim was "startled," that he was "pistol whipped," and that he "begged for his life." Each of the challenged comments is supported by evidence in the record, and most are supported by the appellant's own statements. Likewise, the comments that the victim was carried back to the "dirty little bathroom" and that the informants were "`good citizens' who came in on their own" were legitimate inferences from the evidence. Gray, supra; Ward, supra.

F
The appellant finally argues that the State "urged death on the basis of [the appellant's] defense" by characterizing it as fabrication and a lie. Because the appellant did not object on these grounds at trial, we review this issue under the plain error rule. Rule 45A, Ala. R. App. P.
"Control of closing arguments rests within the broad discretion of the trial court and the trial court's ruling will be reversed only for an abuse of that discretion. Sasser v. State, 494 So.2d 857 (Ala.Cr.App.1986); Speigner v. State, 369 So.2d 39 (Ala.Cr.App.), writ denied, 369 So.2d 46 (Ala.1979). The trial judge is in the best position to determine `when discussion by counsel is legitimate and when it degenerates into abuse.' Sasser at 860. Counsel may comment, draw proper inferences, and draw conclusions from the evidence. Sasser, Speigner. The credibility of witnesses is also a legitimate subject of criticism and discussion by either party during closing arguments. Adams v. State, 484 So.2d 1143 (Ala.Cr.App.1985); Clark v. State, 462 So.2d 743 (Ala.Cr.App.1984)."
Owen v. State, 586 So.2d 958, 960-61 (Ala. Cr.App.1990). The challenged comments were legitimate inferences from the evidence introduced at trial or pertained to the credibility of witnesses. Therefore, no plain error occurred in this regard.

XIV
The appellant's fourteenth contention is that the trial court erroneously admitted into evidence his inculpatory statements to police.

A
First, the appellant argues that the trial court should have suppressed his confession because the State allegedly did not establish exactly what rights Investigator Payne read to him before he made the confession.
"An in-custody statement by an accused is prima facie involuntary and inadmissible; to overcome this presumption, the State must first establish that before the defendant gave his statement the police informed him of his rights, as required by Miranda. Ex parte Callahan, 471 So.2d 463 (Ala.1985). See, also, Swicegood v. State, 50 Ala.App. 105, 277 So.2d 380 (1973). To this end, the State must spell out with clarity and precision the specific Miranda warning the police gave to the defendant. Swicegood."
Johnson v. State, 620 So.2d 709, 712 (Ala. Cr.App.1993).
Testimony during the suppression hearing established the following:
After the appellant's arrest, Payne questioned him. Payne testified that before the appellant made a statement, he read the appellant his Miranda warnings from a Miranda card. The State asked Payne, "What specifically were the warnings that you gave him?" Reading the Miranda card into the record, Payne responded:
"`You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to *931 represent you for any questioning if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements.' And I turned the card over and I said, `Do you understand these rights as explained to you?' And [the appellant] said, `Yes.' I said, `Do you understand that we are not offering you or promising you anything of value, nor are we threatening you to get a statement from you,' and he said he understood. I said, `Having these rights in mind, do you wish to talk with us now?' And [the appellant] said, `Yes.'"
(R. 31-32). Based on this testimony, the State proved precisely what Miranda warnings Payne read to the appellant before he made his statement. The appellant argues that the trial court should have suppressed his confession because Payne did not record that portion of the interrogation when he advised the appellant of his Miranda rights. However, that fact alone would not render the statement inadmissible. Rather, it would be taken into consideration by the jury in determining the weight and credibility to assign to Payne's testimony regarding the appellant's confession. Therefore, the trial court properly denied the appellant's motion to suppress on this ground.

B
Second, the appellant argues that Payne violated his constitutional right to remain silent by continuing to question him after he stated that he did not wish to answer a particular question. Therefore, he argues that any evidence of a statement he made in response that question was inadmissible at trial. The appellant did not object on this ground at the suppression hearing or at trial. Therefore, we review this issue under the plain error rule. Rule 45A, Ala. R. App. R.
After the appellant made his statement, Payne spoke to Brent Wheeler, a State forensics expert, about a .45 caliber pistol recovered from the appellant when he was arrested. Wheeler explained to Payne that the markings on the .45 caliber pistol were the same as, or very similar to, the markings on the .45 caliber shell discovered at the scene of the crime, but that the rifling on the barrel of the pistol was different. Wheeler told Payne that this suggested that the pistol had been altered or replaced.
Payne then questioned the appellant about this information. He testified that he read the appellant his Miranda rights once again and that the appellant acknowledged he understood those rights. Payne then asked the appellant, "Who altered the gun used in the shooting?" The appellant answered, "Bill, I don't want to tell you." Payne responded, "Ron, you just told me about killing a guy in cold blood and you don't want to tell me who altered the gun?" The appellant then told Payne that his friend, Nick Mullins, had replaced the barrel of the .45 caliber pistol with another barrel after the murder took place and that he thought Mullins still had the original barrel. At that time, Payne asked the appellant for his consent to search his apartment for the shoes that he wore during the robbery. He explained to the appellant that other officers would be conducting the search. The appellant signed a written consent form which read as follows:
"I, Ronald Bert Smith, Jr., having been informed of my Constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse consent to such a search, hereby authorize Investigator Harry Renfroe, Jr., and Lisa Hamilton, police officers of the City of Huntsville, State of Alabama, to conduct a complete search of my residence located at 4401 Sparticus Road, Apartment 44. These officers are authorized by me to take from my residence any letters, papers, materials, or other property which they may desire. This written permission is being given by me to the above-mentioned officers voluntarily and without threats or promises of any kind."
*932 The appellant argues that his response to Payne's question about who altered the gun was inadmissible because he unequivocally invoked his right to remain silent by initially responding, "I don't want to tell you." We do not interpret this statement as a clear and unequivocal invocation of the rights afforded by Miranda. The appellant did not request that he have an attorney present to represent him before he answered the question. Cf., Ex parte Cothren, 705 So.2d 861 (Ala.1997), citing Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) ("police officers must immediately cease interrogating a suspect who has clearly asserted his right to have an attorney present during custodial interrogation and that interrogation may not resume unless the suspect initiates and consents to further questioning"). Neither was the appellant's response an unequivocal and unambiguous assertion of his constitutional right to remain silent. Rather, the appellant merely did not want to answer a question that would implicate Mullins as a culprit in the crime. Therefore, Payne was justified in questioning the appellant further with regard to who altered the pistol after the shooting took place. See Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994) (continued questioning of a defendant is permissible where an invocation of Miranda rights is ambiguous or equivocal). This conclusion is supported by the fact that, afterward, the appellant continued to answer Payne's questions concerning the crime and consented to a full-scale search of his apartment.
Furthermore, even if his response was an invocation of his right to be silent on the question of who altered the pistol, the appellant's statement was admissible. "When a purported invocation of a Fifth Amendment privilege is ambiguous, the police may question the accused for the narrow purpose of clarifying the equivocal request." Beard v. State, 612 So.2d 1335, 1341 (Ala.Cr.App.1992) (citations omitted). Here, the appellant's response was ambiguous at best. Therefore, Payne's subsequent question was an entirely proper attempt to clarify the appellant's ambiguous response. Beard, supra. Therefore, the appellant's answer to this question (i.e., that Mullins altered the pistol) was not a response to an unconstitutional or improper question by Payne.
Finally, even if the admission of the statement concerning the barrel of the gun was error, it was harmless error.
"When reviewing the erroneous admission of a voluntary confession, the Appellate Court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the confession with the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt."
Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991). The evidence against the accused must be overwhelming for the harmless error doctrine to apply in these circumstances. Fisher v. State, 665 So.2d 1014, 1017 (Ala.Cr.App.1995).
The evidence against the appellant overwhelmingly pointed toward his guilt. The appellant confessed to killing the victim with a .45 caliber pistol while robbing the convenience store. The appellant testified specifically that he intended to kill the victim. A security camera in the convenience store videotaped the entire crime. The videotape showed the appellant in possession of this weapon, firing it at the victim, and attempting to ransack the cash register after firing the shots. In addition, the videotape corroborated the appellant's description as to the events that occurred in the store both before and after the killing took place. The appellant's defense at trial was that he killed the victim out of jealous rage because the victim was allegedly having an affair with his girlfriend, a position inconsistent with the appellant's original statement to police. Further, the testimony of Monique Ferguson Ickes, Owen Ickes, and Chad Roundtree, as well *933 as the physical and ballistics evidence, overwhelmingly pointed to the appellant's guilt. Therefore, if any error occurred from the admission of the statement regarding the barrel of the gun, such error was harmless because the evidence against the appellant was overwhelming. Fisher, supra.

C
The appellant argues that the State did not satisfy its burden of proving that he confessed voluntarily. Specifically, he argues that his confession was involuntary because: (1) at the time of his arrest, eight officers screamed at him and threatened to kill him; (2) he was not advised of the grounds for his arrest or of his constitutional rights before he arrived at the police station; and (3) he was frightened because of his youth and inexperience with the criminal justice system. The appellant did not raise these specific grounds at trial.
The appellant did not present any testimony at the suppression hearing. The only testimony regarding the appellant's arrest and interrogation came from Payne and Renfroe. Payne testified that when the appellant was arrested, he and another investigator handcuffed the appellant, placed him in a patrol car, and took him to the police station for questioning. Upon arrival, these officers took the appellant to an interrogation room and removed his handcuffs. Payne read the appellant his Miranda rights, and the appellant expressly acknowledged that he understood those rights and indicated that he wanted to talk to Payne about the crime. Payne testified that no offers of reward were made to the appellant. Furthermore, the appellant had all "normal creature comforts" available to him during the interrogation. He was provided with opportunities to use the restroom or to have a drink of water or a soda. At the conclusion of his statement, the appellant expressly acknowledged that he had been advised of his Miranda rights, that he understood those rights, and that he had not been coerced or induced in any manner into making the statement. Payne testified that the appellant spoke in an intelligent manner and appeared to be lucid and sober and not under the influence of alcohol or drugs at the time of the questioning. Upon his request, the appellant was permitted to make a telephone call after making his statement.
Confessions and inculpatory statements are presumed to be involuntary and inadmissible. Ex parte Callahan, 471 So.2d 463 (Ala.1985). For a confession to be admissible, the State has the burden of proving that "`the defendant was informed of his Miranda rights and that the confession was voluntarily given.'" Johnson v. State, 680 So.2d 1005, 1007 (Ala.Cr.App. 1996) (quoting Mann v. State, 581 So.2d 22, 23 (Ala.Cr.App.1991)).
"In determining whether a confession is voluntary, the trial court's finding of voluntariness need only be supported by a preponderance of the evidence. Seawright v. State, 479 So.2d 1362 (Ala.Cr. App.1985). The trial court's decision will not be disturbed on appeal unless it is manifestly contrary to the great weight of the evidence."
Howard v. State, 678 So.2d 302, 306 (Ala. Cr.App.1996).
"`"In reviewing the correctness of the trial court's ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court."' Kennedy v. State, 640 So.2d 22, 26 (Ala.Cr.App.1993), quoting Bradley v. State, 494 So.2d 750, 761 (Ala.Cr. App.1985), aff'd 494 So.2d 772 (Ala.1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987). A trial court's ruling on a motion to suppress will not be disturbed unless it is `palpably contrary to the great weight of the evidence.' Parker v. State, 587 So.2d 1072, 1088 (Ala.Cr.App.1991)."
Rutledge v. State, 680 So.2d 997, 1002 (Ala. Cr.App.1996).
In McLeod v. State, 718 So.2d 727 (Ala. 1998), the Alabama Supreme Court explained *934 the standard used to determine whether a confession was given voluntarily:
"The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the `totality of the circumstances.' Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Cr.App.1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Cr.App.1978) (stating that the true test to be employed is `whether the defendant's will was overborne at the time he confessed') (emphasis added [in McLeod])....
". . . .
"... To determine if a defendant's will has been overborne, we must assess `the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure'; `[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures.' Jackson, 562 So.2d at 1380-81 (citations omitted)."
718 So.2d at 729-30.
Based on the totality of the circumstances, we conclude that the appellant made the statement voluntarily. There is no indication that the appellant's will was overborne by the pressures and circumstances swirling around him. McLeod, supra; Jackson v. State, 562 So.2d 1373, 1380 (Ala.Cr.App.1990). The evidence does not show that Payne or any other officer physically intimidated or psychologically pressured the appellant. There is no evidence that the interrogation lasted for an unreasonable amount of time. Cf., Pardue v. State, 695 So.2d 199 (Ala.Cr.App.1996) (interrogation period of approximately 78 hours rendered the defendant's confession involuntary). Rather, the evidence shows that the interrogation "was conducted in a civil manner free of displays of force, intimidation, or strong-arm tactics." McLeod, 718 So.2d at 730. Finally, the appellant did not appear to be under the influence of drugs or alcohol at the time he made his statement.
Based on this evidence, the State met its burden in proving that the appellant made his statement voluntarily. Therefore, the trial court properly admitted the statement into evidence.

XV
The appellant's fifteenth contention is that the trial court erred in denying his motion to suppress his confession and all physical evidence seized following his arrest because the arresting officers allegedly did not have the probable cause necessary to justify his warrantless arrest. Specifically, he argues that probable cause did not exist because the informants allegedly lacked both reliability and credibility and because the officers allegedly did not independently corroborate the informants' information. The record refutes this contention.
Testimony at the suppression hearing established the following:
On December 1, 1994, Monique Ferguson informed the police that the appellant had admitted to her that he had killed the clerk at the Circle C convenience store. The appellant repeated this admission to Owen Ickes. Both Ickes and Ferguson *935 agreed to assist the police by meeting with the appellant and recording his statements about the murder. Shortly thereafter, they met with the appellant and Mullins. Ferguson concealed a tape recorder in her purse and Ickes wore a police body wire. During this conversation, the appellant confirmed the substance of his initial admission that he had killed the clerk at the Circle C convenience store. When Ferguson attempted to buy from the appellant the .45 caliber pistol used to kill the victim, the appellant refused and the following conversation occurred:
"Ms. Ferguson: You know that .45 that you have?
"[Appellant]: Yeah.
"Ms. Ferguson: You said you would sell it to me. I want to know how much.
"[Appellant]: No, a Taurus 9 [millimeter pistol].
"Ms. Ferguson: A Taurus 9. Well, the.45 that you have, okay? It's on you right now? How much will you sell it to me for?
"[Appellant]: Can't do it.
"Ms. Ferguson: Why?
"[Appellant]: Because it's like my gun. It's like the gun.
"Ms. Ferguson: What if I gave you $500 for it?
"[Appellant]: I still couldn't sell it to you.
"Ms. Ferguson: Why?
"[Appellant]: Because it's not a good gun to use right now.
"Ms. Ferguson: Why?
"[Appellant]: Because it'sÔÇöthat's the gun I used. That's why I don't sell this gun to nobody. You will go to jail if they catch you with this gun.
"Ms. Ferguson: Why would I go toÔÇöI don't understand. Is that the oneÔÇö
"[Appellant]: This is the one I used.
". . .
"Ms. Ferguson: It's the gun that you used for the CircleÔÇö
"[Appellant]: Everything. Everything. Stuff that you don't even know about. This is the gun I used."
The appellant also implicated Jay Zuercher and Chad Roundtree in the crime. The police reviewed the entire taped conversation after Ferguson's and Ickes' meeting with the appellant and Mullins.
Ickes later agreed to assist the police by purchasing the 9mm pistol owned by Jay Zuercher that the appellant had discussed with Ferguson. Ickes also assisted the police by obtaining shell casings fired from that gun. Ballistics tests performed on the gun, the shell casings obtained by Ickes, and the shell casings recovered at the scene of the crime confirmed that the pistol was the one used to shoot the lock to the area containing the convenience store's security camera.
On December 6, 1994, Ickes met with the appellant and signalled the police that the appellant was carrying the .45 caliber pistol he had admitted to using to kill the victim. The police then arrested the appellant and recovered the .45 caliber pistol from the front seat of the truck.
Rule 4.1(a)(1)(i), Ala. R. Crim. P., provides that a police officer may make a warrantless arrest of a person provided that "the officer has probable cause to believe that a felony has been committed, or is being committed, and the person to be arrested committed it ..." See also U.S. v. Watson, 423 U.S. 411, 422, 96 S.Ct. 820, 827, 46 L.Ed.2d 598 (1976).
"`Probable cause ... to conduct a warrantless arrest exists when police have knowledge or information of facts and circumstances sufficient in themselves to warrant a belief by a person of reasonable caution that an offense has been or is being committed by the person to be arrested.' Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 224, 13 L.Ed.2d 142 (1964)."
State v. Adams, 643 So.2d 606, 609 (Ala.Cr. App.1992). "`In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on *936 which reasonable and prudent men, not legal technicians, act.'" Dale v. State, 466 So.2d 196, 199 (Ala.Cr.App.1985), quoting Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).
"`The arresting officer need not have evidence before him that would support a conviction for the offense. He need only have knowledge of facts and circumstances which are reasonably trustworthy and which would lead a prudent man to believe that the accused had committed the offense.'
"Blanco v. State, 515 So.2d 115, 119 (Ala.Cr.App.1987). `Only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.' Spinelli v. United States, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969)."
C.M.B. v. State, 594 So.2d 695, 698 (Ala.Cr. App.), opinion after remand, 594 So.2d 702 (Ala.Cr.App.1991). We must evaluate the totality of the circumstances when determining whether there was probable cause to justify a warrantless arrest. Id.
Contrary to the appellant's assertion, the arresting officers did have probable cause to arrest him. Corroborating the information provided by Ferguson and Ickes, the officers had the taped conversation with the appellant, ballistics reports, Zuercher's 9mm pistol, and the results of their own investigation of the crime scene. Thus, the officers had personal knowledge of facts and circumstances that warranted their reasonable belief that the appellant had murdered the victim in the convenience store. Probable cause existed to support the appellant's warrantless arrest. Therefore, the trial court properly denied the appellant's motion to suppress all seized evidence and his confession obtained following his arrest.

XVI
The appellant's sixteenth contention is that he was deprived of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights when the police allegedly imprisoned him for "several days" without taking him before a judge or magistrate within 48 hours of his warrantless arrest as required by Rule 4.3(a)(1)(iii), Ala. R. Crim. P. See also Hardeman v. State, 651 So.2d 59, 68 (Ala.Cr.App.1994). As a result of this alleged improper detention, the appellant asserts that all evidence seized after the 48-hour period expired should have been suppressed. Because the appellant did not object on these grounds at the suppression hearing or at trial, we review these contentions under the plain error rule. Rule 45A, Ala. R. App. P.
Rule 4.3(a)(1)(iii), Ala. R. Crim. P., provides, in pertinent part, that a person arrested without a warrant
"[s]hall be afforded an opportunity to make bail in accordance with Rule 4.3(b)(3) and 4.4. A judge or magistrate in the county of arrest shall determine whether probable cause exists to believe that the defendant committed the charged offense, by examining any necessary witnesses in accordance with the procedures for making a probable cause determination provided in Rule 2.4. If the judge or magistrate finds that there is probable cause for the arrest of the person, a complaint shall promptly be prepared, filed, and served on the defendant, and the judge or magistrate shall proceed as provided in Rule 4.4 for initial appearance. If a probable cause determination is not made by a judge or magistrate without undue delay, and in no event later than forty-eight (48) hours after arrest, then, unless the offense for which the person was arrested is not a bailable offense, the person shall be released upon execution of an appearance bond in the amount of the minimum bond set in Rule 7.2 and shall be directed to appear either at a specified time and place or at such time and place as he or she shall be subsequently notified of."
The purpose of the requirements of Rule 4.3, Ala. R. Crim. P., is "to ensure that defendants are not forgotten and left in jail without procedural due process." Dutell *937 v. State, 596 So.2d 624, 625 (Ala.Cr. App.1991).
The record refutes the appellant's allegations. He was arrested and placed in jail on the afternoon of Friday, December 6, 1994. Investigator Harry Renfroe, Jr., testified that he obtained an arrest warrant and served it on the appellant at the jail on Saturday, December 7, 1994. Thus, the requirements of Rule 4.3(a)(1)(iii) were satisfied because, within 48 hours after the appellant's arrest, a judge or magistrate found that there was probable cause for the arrest. Further, on Monday, December 9, 1994, the appellant appeared before the District Court of Madison County and counsel was appointed to represent him, as required by Rule 4.4, Ala. R. Crim. P. The appellant was not "forgotten and left in jail without procedural due process." Dutell. Therefore, no plain error occurred in this regard.

XVII
The appellant's seventeenth contention is that the evidence was not sufficient to support his conviction for murder committed during the course of a robbery. See  13A-5-40(a)(2), Ala. Code 1975.
"`In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.' Faircloth v. State, 471 So.2d 485, 489 (Ala.Cr.App.1984), affirmed, Ex parte Faircloth, [471] So.2d 493 (Ala.1985).
". . . .
"`"The role of appellate courts is not to say what the facts are. Our role,... is to judge whether the evidence is legally sufficient to allow submission of an issue for a decision to the jury." Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978). An appellate court may interfere with the jury's verdict only where it reaches a "clear conclusion that the finding and judgment are wrong." Kelly v. State, 273 Ala. 240, 244, 139 So.2d 326 (1962). "The rule is clearly established in this State that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust." Bridges v. State, 284 Ala. 412, 420, 225 So.2d 821 (1969).... A verdict on conflicting evidence is conclusive on appeal. Roberson v. State, 162 Ala. 30, 50 So. 345 (1909). "[W]here there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense." Fuller v. State, 269 Ala. 312, 333, 113 So.2d 153 (1959), cert. denied, Fuller v. Alabama, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960).' Granger, 473 So.2d at 1139.
"... `Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.' White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). `Circumstantial evidence is in no wise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.' Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala. 1985)."
White v. State, 546 So.2d 1014, 1016-1017 (Ala.Cr.App.1989).
Section 13A-5-40(a)(2), Ala. Code 1975, provides that a murder committed "by [a] defendant during a robbery in the first degree or an attempt thereof committed by the defendant" constitutes capital *938 murder. Section 13A-8-41, Ala. Code 1975, provides that:
"(a) A person commits the crime of robbery in the first degree if he violates Section 13A-8-43 and he:
"(1) Is armed with a deadly weapon or dangerous instrument; or
"(2) Causes serious physical injury to another.
"(b) Possession then and there of an article used or fashioned in a manner to lead any person who is present reasonably to believe it to be a deadly weapon or dangerous instrument, or any verbal or other representation by the defendant that he is then and there so armed, is prima facie evidence under subsection (a) of this section that he is so armed."
Section 13A-8-43, Ala. Code 1975, provides that:
"(a) A person commits the crime of robbery in the third degree if in the course of committing a theft he:
"(1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or
"(2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property."
Section 13A-2-23, Ala. Code 1975, provides that:
"A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
"(1) He procures, induces or causes such other person to commit the offense; or
"(2) He aids or abets such other person in committing the offense; or
"(3) Having a legal duty to prevent the commission of the offense, he fails to make an effort he is legally required to make."
We have previously held that:
"To sustain a conviction under  13A-5-40(a)(2) for capital robbery-murder, the state must prove beyond a reasonable doubt: (1) a `robbery in the first degree or an attempt thereof,' as defined by  13A-8-41; (2) a `murder,' as defined by  13A-6-2(a)(1); and (3) that the murder was committed `during' the robbery or attempted robbery, i.e., that the murder was committed `in the course of or in connection with the commission of, or in immediate flight from the commission of the robbery or attempted robbery in the first degree,  13A-5-39(2). Connolly v. State, 500 So.2d 57 (Ala.Cr.App.1985), aff'd, 500 So.2d 68 (Ala.1986). The capital crime of robbery when the victim is intentionally killed is a single offense beginning with the act of robbing or attempting to rob and culminating in the act of intentionally killing the victim; the offense consists of two elements, robbing and intentional killing. Davis v. State, 536 So.2d 110 (Ala.Cr.App.1987); Magwood v. State, 494 So.2d 124 (Ala.Cr.App. 1985), aff'd, Ex parte Magwood, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). The intentional murder must occur during the course of the robbery in question; however, the taking of the property of the victim need not occur prior to the killing. Clark v. State, 451 So.2d 368 (Ala.Cr.App.), cert. denied, 451 So.2d 368 (Ala.1984). While the violence or intimidation must precede or be concomitant with the taking, it is immaterial that the victim is dead when the theft occurs. Thomas v. State, 460 So.2d 207 (Ala.Cr.App.1983), aff'd, 460 So.2d 216 (Ala.1984).
"`As the Alabama Supreme Court held in Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962), "the fact that the victim was dead at the time the property was taken would not militate *939 [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events." Clements v. State, 370 So.2d 708, 713 (Ala.Cr.App.1978), affirmed in pertinent part, 370 So.2d 723 (Ala.1979); Clark v. State, 451 So.2d 368, 372 (Ala.Cr.App.1984). To sustain any other position "would be tantamount to granting to would-be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute." Thomas v. State, 460 So.2d 207, 212 (Ala.Cr.App.1983), affirmed, 460 So.2d 216 (Ala.1984).
"`Although a robbery committed as a "mere afterthought" and unrelated to the murder will not sustain a conviction under  13A-5-40(a)(2) for the capital offense of murder-robbery, see Bufford v. State, supra, O'Pry v. State, supra [642 S.W.2d 748 (Tex.Cr.App. 1981)], the question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. Crowe v. State, 435 So.2d 1371, 1379 (Ala.Cr.App.1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim's property and fled. Cobern v. State, 273 Ala. 547, 550, 142 So.2d 869, 871 (1962). The defendant's intent to rob the victim can be inferred where "[t]he intervening time, if any, between the killing and robbery was part of a continuous chain of events." Thomas v. State, 460 So.2d 207, 212 (Ala.Cr.App.1983), affirmed, 460 So.2d 216 (Ala.1984). See also Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962); Crowe v. State, 435 So.2d 1371 (Ala.Cr.App.1983); Bufford v. State, 382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala.1980); Clements v. State 370 So.2d 708 (Ala.Cr. App.1978), affirmed in pertinent part, 370 So.2d 723 (Ala.1979).'
"Connolly, 500 So.2d at 63."
Hallford v. State, 548 So.2d 526, 534 (Ala. Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).
"It is sometimes said that a robbery committed as a `mere afterthought' and unrelated to the murder will not sustain a robbery. Connolly v. State, 500 So.2d 57 (Ala.Cr.App.1985), aff'd, 500 So.2d 68 (Ala.1986). However, the appellant's intent to rob the victim may lawfully and correctly be inferred where the killing and the robbery were part of a continuous chain of events. Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989)."
Harris v. State, 671 So.2d 125, 126 (Ala.Cr. App.1995).
The trial court correctly explained these principles to the jury, charging as follows:
"The Criminal Code of Alabama says that an intentional murder committed during a robbery in the first degree or an attempt thereof is capital murder. There are two components to the crime which join together to form the highest offense of capital murder. The first component is an intentional murder. A person commits an intentional murder if he causes the death of another person, and in performing the act or acts which cause the death of that person, he intends to kill that person. A person commits a robbery in the first degree if in the course of committing or attempting to commit a theft he uses force against the person of the owner of the property or any other person present with the intent to overcome that other person's physical resistance or physical power of resistance or if he threatens the imminent use of force against the person of that person present with the intent to compel that other person's acquiescence in the taking of or escaping with the property, and in doing so he is armed with a deadly weapon.

*940 "Now to convict Ronald Bert Smith, Jr., of capital murder under those definitions, the State must prove by the evidence beyond a reasonable doubt each of the following elements of an intentional murder committed during a robbery in the first degree or an attempt thereof.
"I will go slowly so some of you can make notes. First, the State must prove that Casey Wilson is dead. Second, the State must prove that the defendant, Ronald Bert Smith, Jr., caused the death of Casey Wilson by shooting him with a pistol. Third, the State must prove that in committing the act which caused the death of Casey Wilson the defendant intended to kill Casey Wilson. A person acts intentionally when it is his purpose to cause the death of another person. The intent must be real and specific. Fourth, the State must prove that the defendant committed or attempted to commit theft of lawful currency of the United States and an undetermined number of packages of cigarettes.
"Fifth, the State must prove that in the course of committing or attempting to commit the theft of lawful currency in an undetermined number of packages of cigarettes, the defendant either used force or threatened the imminent use of force against the person of Casey Wilson with the intent to overcome Casey Wilson's physical resistance or physical power to resist or to compel Casey Wilson's acquiescence to the taking or attempt of taking of lawful currency of the United States and an undetermined number of packages of cigarettes.
"Sixth, that the defendant was armed with a deadly weapon. And seventh and finally, the State must prove that the murder took place during the robbery."
The trial court thereafter defined the word "during" to mean
"during the course of the commission or attempted commission of a robbery or in connection with or in immediate flight from the commission or attempted commission of a robbery."
In addition, the trial court properly instructed the jury on the definition of a "deadly weapon" and the statutory elements of "theft of property" and reminded the jury that
"it is sufficient to prove only that in the course of committing or attempting to commit the theft, the defendant either used force or threatened the imminent use of force against the person of Casey Wilson with the intent to overcome Casey Wilson's physical resistance or physical power to resist or to compel Casey Wilson's acquiescence to the taking or attempted taking of lawful currency of the United States and an undetermined number of packages of cigarettes."
Finally, the trial court properly instructed the jury on the definition of "attempt" as follows:
"An attempt occurs when a person having the intent to commit a specific offense such as robbery or theft of property does any overt act toward the commission of that offense and the person acts intentionally with respect to a result or to conduct when his purpose is to cause that result or to engage in that conduct."
The appellant initially told the police he intended to rob the store. Round-tree also testified that the appellant planned to rob the store. Further, the appellant's actions on the videotape are consistent with an attempt to rob the store. Finally, the evidence showed that Zuercher took cigarettes from the store. Under accomplice liability principles, the evidence was sufficient to hold the appellant responsible for Zuercher's actions. Viewing the evidence in a light most favorable to the State, there was sufficient evidence from which the jury could find beyond a reasonable doubt that the robbery was related to the murder and that the appellant murdered Wilson with the intent to rob the convenience store.

*941 XVIII
The appellant's eighteenth contention is that certain statements by the trial court showed a bias toward a conviction and the death penalty. At the close of the guilt phase, the trial court stated:
"Now, I know each one of you are here at a sacrifice. I told you that at the beginning of the jury selection process. This case has gone on for the entire week and will most likely stretch into tomorrow and possibly next week. I'm aware of some personal conflicts and plans that are being impacted by the length of the trial. And all of you are here at sacrifices of one kind or anotherÔÇöif not a financial sacrifice, then certainly one of your time and your energy. But if you look to me for sympathy, you have looked to the wrong man.
". . . .
"When the door to this jury room closes behind the 12 of you who will deliberate on your verdict, no Government or power on earth can dictate to you what is the truth of this case or what is the justice of it. Rather, you will become the human embodiment of our judicial system, the laws of this state, and the concepts of truth of justice. Those are very high duties and responsibilities indeed, and you should approach them accordingly."
(R. 1407) (emphasis added). The appellant argues that the trial court's statement that the case "will most likely stretch into tomorrow and possibly next week," "gave the jury the unmistakable impression that the judge expected a conviction and the necessity of a jury sentencing hearing." (Appellant's Brief at 91).
The appellant did not make a timely objection to the judge's comment at trial. Therefore, we must review the comment under the plain error rule. Ex parte Land, supra; Rule 45A, Ala. R. App. P. Plain error is error that "has or probably has adversely affected the substantial right of the petitioner." Rule 45A, Ala. R. App. P. However, courts must use the plain error doctrine sparingly, and only in those cases "`"in which a miscarriage of justice would otherwise result."'" Land, 678 So.2d at 232 (citations omitted). When determining whether the trial court's statements are improper, this court must review comments based on the particular facts of each case. McNeely v. State, 524 So.2d 375, 380 (Ala.Cr.App.1986). Comments by the trial court do not constitute error
"`"unless they have affected the result of the trial."' Towns v. State, 494 So.2d 798, 800 (Ala.Cr.App.1986), quoting Cox v. State, 489 So.2d 612 (Ala.Cr.App. 1985). See also McCovery v. State, 365 So.2d 358 (Ala.Cr.App.1978).
"`"To constitute error the judge's actions viewed as a whole must amount to intervention which could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor.... A venerable line of cases indicates judicial intervention must be qualitatively and quantitatively substantial to meet this test...." United States v. Robinson, 687 F.2d 359 (1982) (citations omitted).'"
McNeely, 524 So.2d at 380. The trial court's comment that the trial "will most likely stretch into tomorrow and possibly next week," did not create a predisposition of guilt in the mind of the jury. When read in context, the trial court's comments emphasize its understanding of the sacrifice the members of the jury were making by participating in the lengthy trial while also focusing on the important function of the jury in our legal system. Although the trial court acknowledged the possibility that the trial could extend into the following week, it also emphasized that "no Government or power on earth can dictate to you what is the truth of this case or what is the justice of it. Rather, you will become the human embodiment of our judicial system, the laws of this state, and the concepts of truth of justice." This does not support the appellant's arguments that the statement created an impression that *942 the judge expected a capital murder conviction. Therefore, we find no plain error in the trial court's comments.

XIX
The appellant's nineteenth argument is that the trial court erroneously found the existence of two aggravating circumstances.

A
First, he argues that the trial court improperly found as an aggravating circumstance that the murder was especially heinous, atrocious, or cruel. He argues that the trial court's finding that he killed the victim "to avoid later identification" is not supported by the evidence. However, the appellant testified that he tried to make the crime look like a botched robbery attempt because "I didn't want anybody tying him [the victim] in with [Ms. Stehle] and then in with me." Therefore, the trial court's finding of the aggravating circumstance was a proper inference from the appellant's own testimony. Further, Officer Renfroe's testimony concerning the heinousness of the crime was not improper, as set forth above.
"In Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), this Court held that the standard applicable to the `especially heinous, atrocious, or cruel' aggravating circumstance under  13A-5-49(8) is that for a crime to fit within that section it must be one of `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.'
". . . .
"This Court has decided upon an approach for the purposes of  13A-5-49(8). In comparing capital offenses for the purposes of determining whether a capital offense was `especially heinous, atrocious or cruel,' the court uses the Kyzer standard. Capital offenses falling under  13A-5-49(8) are, pursuant to the Kyzer standard, those `conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' Kyzer, 399 So.2d at 334."
Ex parte Bankhead, 585 So.2d 112, 124-25 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993).
In its order addressing the statutory aggravating circumstance that the offense was especially heinous, atrocious, or cruel, the trial court noted:
"This was an execution-style slaying. Casey Wilson was pistol-whipped and beaten into helpless submission, but Smith nevertheless killed him to avoid later identification....
"Casey Wilson, on his knees, bruised, bleeding from the beating Smith inflicted, begged for his life, for his newborn son....
"Those pleas prove that Wilson feared for his life, that he was in `mental agony resulting from an awareness of sure and impending death.' ...
"... Such evidence also establishes that the crime committed was `conscienceless or pitiless' and `unnecessarily torturous to the victim,' both of which undergird this aggravating circumstance....
"The evidence also established that Smith inflicted death `with utter indifference to, or even enjoyment of, the suffering of Casey Wilson.... Chad Roundtree testified that when the three returned to his apartment following the incident, Smith bragged that `you should hear the sound a body makes when the last breath goes out of it.' Smith, smiling, asked Roundtree if he wanted to watch the tape of the killing....
"Smith did not destroy the tape. In contrast, he threw the surveillance recorder into a trash dumpster and switched barrels in his gun to thwart ballistic identification. Thus, there is merit to the State's assertion that he kept it as a `trophy.'
"Nick Mullins, who altered the pistol, confirmed Smith bragged about the slaying: he `smiled, and kind of laughed' when describing how Wilson had `pleaded for his life' before he killed him." *943 (Footnotes omitted.) Clearly, the trial court properly found that the circumstances surrounding the murder were "especially heinous, atrocious, or cruel." Hutcherson v. State, 677 So.2d 1174, 1200 (Ala.Cr.App.1994), rev'd on other grounds, 677 So.2d 1205 (Ala.1996); Ex parte Bankhead, supra; Henderson v. State, 583 So.2d 276, 304 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Ex parte Kyzer, 399 So.2d 330 (Ala.1981).

B
The appellant also argues that the trial court improperly found as an aggravating circumstance that the murder occurred during a robbery in the first degree or an attempt thereof. See  13A-5-40(a)(2), Ala. Code 1975. For the reasons set forth above, the State presented sufficient evidence to establish that a robbery occurred.
The appellant further argues that the use of his conviction for robbery both as an element of capital murder and as an aggravating circumstance improperly punishes him twice for the same act. This practice is commonly referred to as "double counting" or "overlapping." Section 13A-5-50, Ala. Code 1975, provides, in pertinent part:
"The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence."
Under  13A-5-50, a jury may consider an element of capital murder as an aggravating circumstance if that element is specified in  13A-5-49. Furthermore, we have held that the use of an element of capital murder as an aggravating circumstance does not punish a defendant twice for the same offense. Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995).
"`This practice, known as "double counting" or "overlapping," has been upheld. Haney v. State, 603 So.2d 368 (Ala.Cr. App.1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Kuenzel [v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)].
"`Section 13A-5-50, Code of Alabama 1975, states, in part, as follows:
"`"The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence."
"`Clearly,  13A-5-50 provides that a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in  13A-5-49. Further, this court has repeatedly held that the use of an element of capital murder in such a way does not, as the appellant argues, punish a defendant twice for the same offense. Kuenzel, supra; see also Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
"`"A capital punishment scheme, under which the same felony may form the basis of an essential element of the crime and an aggravating circumstance for consideration by the jury in recommending a sentence, does not constitute a denial of the guarantee against double jeopardy."
"`Kuenzel, 577 So.2d at 488, quoting Fortenberry v. State, 545 So.2d 129, 142 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).'
"Burton, 651 So.2d at 658."
*944 Hutcherson, 677 So.2d at 1201. Thus, the trial court properly found as an aggravating circumstance that the murder was committed during a robbery in the first degree or an attempt thereof.

XX
The appellant's twentieth contention is that the trial court improperly allowed what he says were inflammatory or cumulative photographs into evidence. Specifically, he challenges autopsy photographs and photographs of the victim while he was alive. Although he challenged the admission of the autopsy photographs at trial, he did not challenge those photographs of the victim while he was alive. Therefore, we will review the latter using a plain error analysis. Rule 45A, Ala. R. App. P.
"`Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence.... Finally photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.'"
Gaddy v. State, 698 So.2d 1100, 1148 (Ala. Cr.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997) (quoting Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989)).
"`[P]hotographs depicting the character and location of wounds on a deceased's body are admissible even though they are cumulative and are based on undisputed matters. Magwood [v. State], 494 So.2d [124, 141 (Ala.Cr.App.1985), affirmed, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986)]. The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried. Id. Also, a photograph may be gruesome and ghastly, but this is not a reason to exclude it as long as the photograph is relevant to the proceedings, even if it tends to inflame the jury. Id.'
"Ex parte Bankhead, 585 So.2d 112 (Ala. 1991). Accord, Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); McElroy's at  207.01(2)."
Parker, 587 So.2d at 1092-93. Furthermore, photographs that depict the crime scene are relevant and therefore admissible. Aultman v. State, 621 So.2d 353 (Ala. Cr.App.1992), cert. denied, 510 U.S. 954, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993); Ex parte Siebert, 555 So.2d 780, 783-84 (Ala. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987). Finally,
"[a]t the penalty phase the prosecutor had the burden of proving any statutory aggravating circumstances. The photographs of the victim's body were relevant to proving the aggravating circumstance that the crime was `especially heinous, atrocious, and cruel.' Bankhead v. State, 585 So.2d 97 (Ala.Cr.App. 1989), remanded on other grounds, 585 So.2d 112 (Ala.), on remand 585 So.2d 133 (1991).
"`"[P]hotographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors." Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See generally C. Gamble, McElroy's Alabama Evidence,  207.01(2) (4th ed.1991). "The photographs of the victim were properly admitted into evidence. Photographic exhibits are admissible even though they may be cumulative, ... demonstrative of undisputed facts, ... or gruesome...." Williams v. State, 506 So.2d 368, 371 (Ala.Cr.App.1986), cert. denied, 506 So.2d 372 (Ala.1987).' *945 "DeBruce v. State, 651 So.2d 599, 607 (Ala.Cr.App.1993). See also Ex parte Bankhead, 585 So.2d 112 (Ala.1991). The court did not err in allowing photographs of the victim's body to be received into evidence."
Hutcherson, 677 So.2d at 1200. See also Giles v. State, 632 So.2d 568 (Ala.Cr.App. 1992), 632 So.2d 577 (Ala.1993), cert. denied, 512 U.S. 1213, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).
In this case, the autopsy photographs were relevant to show the location and severity of the victim's wounds. They also provided relevant information, based upon scientific testimony, about the location of the gun when the victim was shot, the order in which the wounds were inflicted, and the cause of the victim's death. The State argued that it selected the least inflammatory photographs, and the trial court found that the photographs were not unduly prejudicial or shocking and that "their relevance appears... to outweigh the prejudicial impact." Accordingly, the trial court properly admitted the autopsy photographs into evidence. Furthermore, the photographs of the victim while he was alive were relevant to establish his identity and were not unduly prejudicial. The appellant has not shown that their admission has or probably has affected one of his substantial rights. Therefore, we find no plain error in the admission of these photographs into evidence.

XXI
The appellant's twenty-first argument is that Alabama's method of execution results in the infliction of cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution. Numerous cases have held that the death penalty is not per se cruel and unusual punishment. Further, electrocution is not a cruel and unusual method of capital punishment. Williams v. State, 627 So.2d 985 (Ala.Cr.App.1991), aff'd, 627 So.2d 999 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Boykin v. State, 281 Ala. 659, 207 So.2d 412 (1968), reversed on other grounds, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

XXII
The appellant's twenty-second argument is that he is entitled to a new trial based on the cumulative effect of all the above alleged errors. However, our review of the record does not reveal any errors that were prejudicial to the appellant. Accordingly, we find the appellant's argument to be without merit.

XXIII
Pursuant to  13A-5-53, Ala. Code 1975, we must address the propriety of the appellant's conviction and sentence of death. The appellant was indicted and convicted of capital murder because the murder was committed during the course of a robbery.  13A-5-40(a)(2), Ala. Code 1975.
The record does not indicate that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor.  13A-5-53(b)(1), Ala. Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. The trial court found two aggravating factors: 1) the murder was committed during the course of a robbery,  13A-5-49(4), Ala. Code 1975, and 2) the murder was especially heinous, atrocious, or cruel compared to other capital offenses,  13A-5-49(8), Ala. Code 1975. The trial court found one statutory mitigating circumstance: 1) the appellant had no significant prior criminal history,  13A-5-51(1), Ala. Code 1975. The trial *946 court found 16 nonstatutory mitigating circumstances: (1) prior to November 8, 1994, the appellant had no history of assaultive behavior; (2) after his arrest, the appellant did not show any tendencies of violence towards others; (3) with the exception of the events on November 8, 1994, the appellant had always been a quiet, polite individual; (4) the appellant did not resist arrest; (5) the appellant voluntarily confessed after being advised of his right to remain silent and without asking for assistance of counsel; (6) upon his arrest, the appellant cooperated with law enforcement officials; (7) the crime was out of character for the appellant; (8) the appellant had adapted well to life in custody; (9) the appellant had become a "model prisoner"; (10) while in custody, the appellant had made improvements in his mental and emotional problems; (11) while in custody, the appellant had helped other inmates; (12) the appellant had made improvements with the help of his religious faith; (13) while in prison, the appellant would be able to make a contribution to society by helping other inmates; (14) the appellant had served in the United States military; (15) the appellant had maintained a good work record; and (16) the appellant had a son. The sentencing order shows that the trial court weighed the aggravating circumstances against the mitigating circumstances and the jury's advisory verdict before sentencing the appellant to death. That decision is supported by the record, and we agree with the trial court's findings.
Section 13A-5-53(b)(2) requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant's sentence of death. After weighing the aggravating circumstances against the mitigating circumstances, we find that death is the appropriate sentence.
As required by  13A-5-53(b)(3), we must determine whether the appellant's sentence is disproportionate or excessive when compared to the penalties imposed in similar cases. The appellant murdered Casey Wilson during the commission of a robbery. Similar crimes have been punished by death throughout this state. See, e.g., Henderson v. State, 583 So.2d 276 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989); Floyd v. State, 486 So.2d 1309 (Ala.Cr.App. 1984), aff'd. 486 So.2d 1321 (Ala.1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1328, 94 L.Ed.2d 179 (1987). Thus, the sentence is neither disproportionate nor excessive.
Finally, we have searched the entire record for any error that may have adversely affected the appellant's substantial rights, and we have found none. Rule 45A, Ala. R. App. P.
Accordingly, the appellant's conviction and sentence of death by electrocution are hereby affirmed.
AFFIRMED.
All judges concur.

APPENDIX "A"

[TRIAL COURT'S]

SENTENCING ORDER
Ronald Bert Smith, Jr., was convicted of a capital offense: intentional murder committed during the course of a robbery in the first degree or an attempt thereof, as charged in the indictment. Therefore, as required by Alabama Code  13A-5-47(d)(1975), this Court enters the following findings of fact.

SUMMARY OF CRIME AND DEFENDANT'S PARTICIPATION
During the early morning hours of Tuesday, November 8, 1994, Ronald Bert Smith, Jr., Jay Zuercher, and Chad Roundtree were riding in a pickup truck owned by Smith, but then driven by Roundtree. Smith turned to Zuercher and *947 asked: "Do you want to do it?"[1]ÔÇö"it" meaning, to rob the Circle C convenience store at the intersection of Byrd Springs Road with South Memorial Parkway.[2] Zuercher replied, "Yes."[3] Smith directed Roundtree to the store, and they parked behind it.
Smith and Zuercher got out of the truck; Roundtree remained in the driver's seat. Smith said to Zuercher: "I'm going to `pop' the guy. When you hear the shots, come in." Zuercher replied: I've got your back," and proceeded to cover his head and face with a black T-shirt, "Ninja" fashion.[4]
Smith entered the store at 3:24:15 a.m.[5] He walked quickly to the drink coolers and removed a soft drink.[6] He then approached the counter area where Casey Wilson,[7] the lone clerk on duty at that time of night, was standing.
Smith placed the bottle on the counter. As Wilson began to enter the cost of the apparent purchase into the cash register, Smith pulled a Colt .45 caliber semi-automatic pistol[8] from the waistband of his pants and
"told the clerk to open up the register * * * to give me the money, but for some reason the register malfunctioned, so I was going to put him in the bathroom and try myself."
Later in his tape recorded statement, Smith reiterated the incident as follows:
"Then, I pulled the gun out and I said, `open the register.' ... He tried; he didn't really say anything. ... He couldn't do it. So I started backing him up, and I said, you know, I was giving him this, and I said, `get back, get back.'"
At 3:24:51 a.m., Smith forced Wilson at gun point into the restroom at the rear of the store. They were in the restroom area for nineteen seconds, during which Smith pistol-whipped Wilson about the head and body,[9] and shot him in the left arm.[10] In Smith's words:

*948 "He made a move at me, you know, [and] I pulled the trigger on the gun cause I was scared. * * * * [But, the gun] didn't fire.[11] * * * * He reached out to grab me so I hit him with it. * * * * And then he fell in the bathroom. I tried to get the door shut and I was, you know, real scared, and he started reaching for me, so I pulled the trigger again, and this time it went off.[12]
At 3:25:02 a.m. (while Smith and Wilson still were in the restroom area) the videotape showed Zuercher entering the store, holding a gun in his right hand.[13]
At 3:25:10 a.m., Smith returned to the cash register; during the next thirty-four seconds, he tried to gain access by punching various keys.[14] He was not successful, and looked under the counter where the safe was located. He appeared to manipulate the safe's combination lock.
At 3:25:42 a.m., Smith returned to the restroom at the rear of the store. It is the opinion of this Court that, although not clearly in view, Smith fired the killing shot into Casey Wilson's head during the next thirteen-second interval.[15] The videotape shows Smith, after stepping out of the restroom, retrieving spent shell casings from the floor.
At 3:26:38 a.m., Zuercher reached toward a display rack near the cash register and grasped an object (apparently a pack of cigarettes), which he placed in his pants' pocket.
At 3:26:45 a.m., Smith and Zuercher ran out of the store. Before leaving the parking *949 lot, however, one of them remembered the store had security cameras which probably had recorded the incident.[16] Smith twice ran back into and out of the store: ultimately returning to a storage room where the videocassette recorder was locked in a metal cabinet.
At 3:31:31 a.m., the surveillance tape went blank. Smith had used Zuercher's 9mm Beretta semi-automatic pistol to blast open the lock. He ripped the recorder from the cabinet and left the store for the final time. The three accomplices drove to Roundtree's apartment, where Smith removed the tape from the recorder.[17]
At 3:59 a.m., a uniformed police officer arrived at the store in response to a customer's telephone call that no clerk was present. Finding the restroom door closed, the officer pushed it open and discovered Casey Wilson lying on the floor in pools of blood. He checked for a pulse, but detected none and secured the scene until homicide investigators arrived.
Almost one month passed before investigators developed their first lead. On December 1, 1994, Monique Ferguson informed police that Smith had bragged to her of killing the clerk at the Circle C store. Smith repeated his boast to Ferguson's boyfriend (now husband), Owen Ickes.[18] Both agreed to assist police. They were given a tape recorder, instructed to find Smith, and catch him talking about the murder. During the early morning hours of December 2, Ferguson (who concealed the recorder in her purse) and Ickes (who wore a police "body wire") engaged Smith and Nick Mullins in a conversation on Hobbs Island Road near the Tennessee River. During that encounter, Smith confirmed the substance of his prior statements: e.g., Ferguson attempted to purchase Smith's .45 caliber pistol, but he refused to sell it, saying "it is The gun." The tape was delivered to police.[19]
Owen Ickes later assisted police in obtaining fired shell casings from (and eventually purchasing) the 9mm Beretta semiautomatic pistol owned by Jay Zuercher.[20] Ballistic tests confirmed that gun had been used to shoot open the lock on the metal cabinet protecting the store's surveillance recorder.
On December 6, 1994, following directives from police, Owen Ickes persuaded Ronald Smith to accompany him to a shooting range for target practice with the.45 caliber pistol. They left Smith's apartment in Ickes' truck. En route, Ickes stopped at a convenience store and went inside, leaving Smith in the truck alone. Smith was quickly surrounded by police and arrested. After being advised of his Miranda rights, Smith gave a taped confession.[21]
The jury found Ronald Bert Smith, Jr., guilty of intentionally killing Casey Wilson with a pistol during a robbery in the first degree or an attempt thereof, in violation of Alabama Code  13A-5-40(a)(2).

THE SECOND-STAGE SENTENCING HEARING
Following a recess, this Court conducted a sentencing hearing before the same twelve jurors,[22] who returned a majority verdict recommending, by a vote of 7 to 5, *950 a sentence of life imprisonment without parole.[23]

THE THIRD-STAGE SENTENCING HEARING
Following preparation of a written presentence investigative report,[24] this Court conducted a nonjury sentencing hearing for the purposes of receiving evidence on any portion of the report which was the subject of factual dispute, receiving noncumulative evidence, and hearing arguments concerning the existence or nonexistence of aggravating and mitigating circumstances and the proper sentence to be imposed in the case.[25]
Based upon the evidence presented at trial, the evidence presented during the second- and third-stage sentencing hearings, and the pre-sentence investigative report, this Court now proceeds to "enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstances enumerated in Section 13A-5-51, and any additional mitigating circumstance offered pursuant to Section 13A-5-52."[26]

AGGRAVATING CIRCUMSTANCES
Only two of the eight aggravating circumstances listed in section 13A-5-49 were asserted by the State:
 13A-5-49(4) ÔÇö"The capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit,... robbery ...."
The verdict finding defendant guilty of capital murder as charged in the indictment established this aggravating circumstance beyond a reasonable doubt.[27]
 13A-5-49(8) ÔÇö"The capital offense was especially heinous, atrocious or cruel compared to other capital offenses."
Our appellate courts have defined the key words of this statute as follows:
"`[H]einous means extremely wicked or shockingly evil; ... atrocious means outrageously wicked and vile; and ... cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital feloniesÔÇöthe conscienceless or pitiless crime which is unnecessarily torturous to the victim.'"
Johnson v. State, 399 So.2d 859, 869 (Ala. Crim.App.1979), aff'd in part and rev'd in part, 399 So.2d 873 (Ala.1981). Applying those definitions to the evidence herein, this Court finds this aggravating circumstance to have been proven beyond a reasonable doubt.
This was an execution-style slaying. Casey Wilson was pistol-whipped and beaten *951 into helpless submission, but Smith nevertheless killed him to avoid later identification.
"Execution-type slayings evincing a cold, calculated design to kill, fall into the category of heinous, atrocious or cruel.... We recognize that an instantaneous death caused by gunfire is not ordinarily a heinous killing. ... However, when a defendant deliberately shoots a victim in the head in a calculated fashion to avoid later identification, after the victim has already been rendered helpless by gunshots to the chest, such `extremely wicked or shockingly evil' actions may be characterized as especially heinous, atrocious, or cruel.
Bush v. State, 431 So.2d 555, 560-561 (Ala. Crim.App.1982) (emphasis added) (citations omitted), aff'd, 431 So.2d 563 (Ala. 1983), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983).
Casey Wilson, on his knees, bruised, bleeding from the beating Smith inflicted, begged for his life, for his newborn son.
"Ron hit the clerk and knocked him to his knees. And then he said the guy was holding up his hand telling him to `stop, I got a baby. Stop, I got a baby, six-month-old baby.'"[28]
Those pleas prove that Wilson feared for his life, that he was in "mental agony resulting from an awareness of sure and impending death." Lawhorn v. State, 581 So.2d 1159, 1175 n. 7 (Ala.Crim.App.1990), aff'd, 581 So.2d 1179 (Ala.1991), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991).
"Evidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was heinous, atrocious, and cruel.
White v. State, 587 So.2d 1218, 1234 (Ala. Crim.App.1990), aff'd, 587 So.2d 1236 (Ala. 1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992). Such evidence also establishes that the crime committed was "conscienceless or pitiless" and "unnecessarily torturous to the victim," both of which undergird this aggravating circumstance. Lawhorn v. State, 581 So.2d at 1174; Ex parte Whisenhant, 555 So.2d 235, 243-244 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990).
The evidence also establishes that Smith inflicted death "with utter indifference to, or even enjoyment of, the suffering of" Casey Wilson. Johnson v. State, 399 So.2d 859, 869 (Ala.Crim.App.) (cite omitted); aff'd in part, rev'd in part, 399 So.2d 873 (Ala.1981). Chad Roundtree testified that when the three returned to his apartment following the incident, Smith bragged that "you should hear the sound a body makes when the last breath goes out of it." Smith, smiling, asked Roundtree if he wanted to watch the tape of the killing. (Roundtree ordered Smith to "get the hell out of my apartment!" and then vomited.)
Smith did not destroy the tape. In contrast, he threw the surveillance recorder into a trash dumpster and switched barrels in his gun to thwart ballistic identification. Thus, there is merit to the State's assertion he kept it as a "trophy."[29]
Nick Mullins, who altered the pistol, confirmed Smith bragged about the slaying: he "smiled, and kind of laughed" when describing how Wilson had "pleaded for his life" before he killed him.

 13A-5-51 STATUTORY MITIGATING CIRCUMSTANCES
(1) "The defendant has no significant history or prior criminal activity":
Discussion: This mitigating circumstance was asserted and proven. Defendant's only previous criminal activity was a 1990 misdemeanor: illegal possession of *952 alcohol by a minor, for which he forfeited a cash bond to the City of Huntsville.
(2) "The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance":
Discussion: This circumstance was neither asserted nor established by the evidence.
(3) "The victim was a participant in the defendant's conduct or consented to it":
Discussion: This circumstance was neither asserted nor established by the evidence.
(4) "The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor":
Discussion: This circumstance was neither asserted nor established by the evidence.
(5) "The defendant acted under extreme duress or under the substantial domination of another person":
Discussion: This circumstance was neither asserted nor established by the evidence.
(6) "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired":
Discussion: Defendant contends his capacity to appreciate the criminality of his conduct was substantially impaired by his physical and mental states: i.e., "he had imbibed quantities of Tanqueray [gin] and beer during the afternoon and evening leading up to the crime, and, he was in a seething rage over Casey Wilson's alleged relationship with [Ms. Stehle]."
Any alcohol consumption was voluntary and, even according to Smith's own testimony, did not negate a specific intent to kill.[30] Smith's actions immediately following the crime, in finding a way to remove the videocassette recorder from a locked cabinet, demonstrate a thought process that was able to perceive a problem and solve it. In flight from the crime, Smith demanded that Chad Roundtree, who was out of control from fear and panic, stop the truck and let him drive; Smith then drove far better than he. Roundtree said Smith's speech was not slurred, and he was very definite in his directions. Moreover, Smith gave no indication of mental distress or gross intoxication when, only a few hours later, he reported "as scheduled" to his job as cashier/clerk at the Discount Food Mart on Bailey Cove Road, and where ironically:
"he was one of several employees ... the manager spoke to about robbery procedures. ... Smith reportedly gave no indication as to what had transpired less than three hours earlier. [Pre-sentence Investigative Report, at page 5 (emphasis added).]"
At all times since that date, Smith has been able to clearly recall and relate the material events that occurred prior to, during, and after the commission of the offense. Hence, there is no convincing evidence suggesting that alcohol affected Smith to any appreciable degree.
Smith denied going into the store for the purpose of robbery, saying police had suggested that motive during interrogation and he adopted the idea because it "sounded better" than the "true reason" for this crime.[31] Smith said he went there in a seething rage, specifically intending to kill Casey Wilson for having an affair with Smith's former lover: a nude dancer at the Fantasia nightclub whose stage name was *953 "Alexis."[32] The weight to be accorded this contention (that Smith killed while under the influence of a seething rage of jealous anger) depends, in large part, upon the credibility of Smith's assertion that Wilson had a relationship with "Alexis." That proposition is refuted by these items of evidence:
* Smith was the only witness who put Wilson either with "Alexis" or in the Fantasia nightclub.
* The dates Smith claims to have seen Wilson with "Alexis" fell during the week following the birth of Wilson's son.[33] The paternal grandparents flew to Huntsville and spent October 1-6 with their son and daughter-in-law. Except for going directly to and from work, Wilson was with his wife, son, and parents the entire time, and there was no opportunity, much less rational reason, for him to be cavorting with another woman.
* Smith never mentioned jealousy as a motive for killing to his accomplice, Chad Roundtree, or to his roommate, Josh Zimmerman.
* Smith never discussed such a relationship or purpose for the killing during several conversations with Monique Ferguson, who knew both Smith and "Alexis," and was familiar with the nightclub scene.
* Smith never hinted at such a nexus during his taped confession. In response to the question, "So, what made you decide to rob that place?," Smith said: "To tell you the truth, I don't know."[34]
* Smith never asserted such a basis for his actions to anyone, until a few days before trial.
These uncontroverted facts strongly suggest Smith's story was a last-minute fabrication, designed to reduce his culpability from capital murder to mere murder.
For all the foregoing reasons, this Court rejects defendant's contention that the sixth statutory mitigating circumstance was established. Thompson v. State, 503 So.2d 871, 881 (Ala.Crim.App.1986), aff'd, 503 So.2d 887 (Ala.1987).
(7) "The age of the defendant at the time of the crime":
Discussion: Smith's date of birth is January 13, 1971. He thus was two months shy of his 24th birthday on the date of this crime. He graduated from high school with honors, five and a half years before. He had an Associate of Science Degree in general education from Calhoun Community College. He was employed, and enlisted in the United States Army Reserves. He had fathered a son, who was five months old at the time. For those reasons, age is rejected as a statutory mitigating circumstance. See, e.g., Thompson v. State, supra; Bufford v. State, 382 So.2d 1162, 1174 (Ala.Crim.App.1980).[35]

NONSTATUTORY MITIGATING CIRCUMSTANCES
Alabama Code  13A-5-52 provides that a defendant is entitled to offer evidence of factors in mitigation other than those specifically listed in  13A-5-51 above.
"These mitigating considerations, known generally as non-statutory mitigating circumstances, include every aspect of the character or record of the accused, or the circumstances surrounding the *954 offense. Examples of non-statutory mitigating circumstances include the nature of the defendant's family and societal relationships and responsibilities, no history of acts of violence, evidence of an impoverished, unstable, or traumatic childhood, good work, military, or prison habits or record, psychological problems, drug abuse, educational difficulties, cooperation with law enforcement, good character, expressions of remorse, or personal character adjustments during the defendant's incarceration."[36]
The following nonstatutory mitigating circumstances were asserted by defense counsel during the second- and third-stage sentencing hearings.
(1) Prior to November 8, 1994, defendant had no history of assaultive behavior.
(2) Since his arrest, defendant has shown no tendencies toward violence against others.
(3) With the exception of the events on November 8, 1994, defendant always had been a quiet, polite individual.
Discussion: These three are discussed together, because they are cumulative: as defense counsel said during argument, "they go hand-in-hand."
All evidence indicates that, during his formative years, Smith was a quiet, polite, respectful, even gentle young man. There nevertheless was testimony about him fighting during the year before this crime: once assaulting another patron of the Fantasia nightclub, whom he perceived to be bothering "Alexis," and on another occasion with Alexis herself. In spite of that contradictory evidence, this Court finds these mitigating circumstances to have been substantially proven, and will give them appropriate weight.
(4) Prior to November 8, 1994, defendant had never fired a gun at anyone.
Discussion: Smith made this assertion during the third-stage sentencing hearing. (It should be contrasted with his pre-arrest boasts of being a Mafia hit man discussed infra). Such conduct is expected, and is not entitled to consideration in mitigation.
(5) Defendant did not resist arrest.
Discussion: When police approached the truck in which Smith was apprehended, he was observed by Investigator Payne to move his hand toward the .45 cal. pistol on the seat beside him. Payne warned Smith that, if he did not immediately put his hands on the dash where they could be seen, Payne would "blow his brains out." Smith complied, and did not thereafter struggle with arresting officers. For that reason, this mitigating circumstance was substantially proven, but will not be given great weight.
(6) Defendant voluntarily confessed after being warned of his right to remain silent, without asking for the assistance of counsel.
Discussion: This was established: Smith's statement (State's Exhibit 2) was more descriptive and forthcoming than Chad Roundtree's (State's Exhibit 7). It will be given consideration in mitigation.
(7) Upon his arrest, defendant cooperated with law enforcement officials.
Discussion: This was true, but it is cumulative with the foregoing circumstances. To the extent this assertion may be considered separate from (5) and (6), it is not given substantial weight: "the fact that [defendant] behaved well during the investigation and trial is to be expected and ... is not necessarily a proper factor to consider as a mitigating circumstance." Morrison v. State, 500 So.2d 36, 51 (Ala. Crim.App.1985), aff'd, 500 So.2d 57 (Ala. 1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987) (decided under former  13-11-7).
(8) The offenses were committed while defendant was under the influence of alcohol.
Discussion: Smith's consumption of alcohol has been fully discussed above, in relation to the sixth statutory mitigating *955 circumstance.... For the reasons stated there, influence of alcohol as a nonstatutory mitigating circumstance is rejected as not proven.
(9) The crimes committed were out of character for defendant.
Discussion: This statement is accurate, if one focuses only upon the years prior to Smith's graduation from high school. Smith's family regularly attended a United Methodist Church, where he was active in Youth Fellowship. He was a Boy Scout, and attained the rank of Eagle [Scout] at 15. He joined the Order of DeMolay, and several adult leaders say he was "a very trustworthy, easy-going young man" who "rarely would lose his temper," and who generally was well-liked and respected. Family friends and neighbors maintain he was quiet, polite, and respectful. He graduated from one of the best schools in the public system with honors: a member of the National Honor Society his Junior and Senior years; awarded an "Advanced Diploma" at graduation; and offered (but refused) a three-year Naval ROTC scholarship to Auburn University.
The weight of the foregoing complex of mental and ethical traits marking Smith's formative years is lessened when one looks at the five and a half year period between his graduation from high school and the date of this crime. Once Smith left the shelter of his parents' home for the unrestricted life of a college freshman, the path of his life took a very different turn. He began to drink heavily, skipped classes, and withdrew from college before the end of the first year. He returned home, but apparently not with the contrite humility of one who had squandered both educational opportunities and his parents' financial resources. He quarreled rebelliously, eventually was "kicked out" of the household, and began to wander with other young men who were as lost as he. In a perverted effort to gain respect, Smith became a swaggering, "loud, mouth-runner," boasting of being a "hit man and collections person" for the "Dixie Mafia": "He said he collected on gambling debts."[37] He fathered one child out of wedlock, and sank deeper into undisciplined, irresponsible conduct: drinking, and regularly "hanging out" at the Fantasia nude-dancing nightclub.
Without question, the attributes or features that make up and distinguish Smith's formative years stand in stark contrast to his adult conduct, and to this crime. They also diverge from the background of cold-blooded killers: typically products of poverty, a broken home, physical or sexual abuse, and social deprivation. Smith comes from an intact, middle-class family.[38] Yet, those characteristics cut two ways. They are concurrently mitigating and aggravating. Smith's background exposed him to virtually all of the values that are central to an ordered society; the awards of his youth opened avenues that pointed to a successful career based upon honest effort. But, Smith spurned society's road signs and took the way that led him to where he is today. He chose to wallow in the gutter; he was not born into it.
Therefore, while this Court accepts this nonstatutory mitigating circumstance as having been substantially proven, the weight to be accorded it must be affected by all that has been said above.
(10) Defendant has adapted well to life in custody.
(11) Defendant has become a "model prisoner."
*956 (12) While in custody, defendant has made improvements in his mental and emotional problems.
(13) While in custody, defendant has helped other inmates.
(14) Defendant has made improvements with the help of his religious faith.
(15) In prison, defendant would be capable of helping other inmates, and thereby of making a contribution to society.
Discussion: These nonstatutory circumstances asserted by defense counsel are considered together, because they are cumulative. Based upon the testimony of Madison County Deputy Sheriff Terrence Petty during the second-stage sentencing hearing, and the testimony of Patsy Wilson and defendant during the third-stage hearing, this Court finds all to have been proven. These sixÔÇötogether with those mitigating circumstances discussed in (1)-(3), (5)-(7) aboveÔÇöall indicate Smith could be integrated into long-term prison life without significant difficulty, and with reasonable expectations that he would function well in a penal institution.
(16) Defendant is "treatable" in a prison setting.
Discussion: This is cumulative, but is rejected as a separate mitigating circumstance. "In capital sentencing decisions... rehabilitation plays no role...." Harris v. Alabama, 513 U.S. 504, 516, 115 S.Ct. 1031, 1038, 130 L.Ed.2d 1004 (1995) (Stevens, J., dissenting).
(17) Defendant is remorseful.
Discussion: Smith's swaggering and boasting after this murder, his demeanor when questioned by Investigator Payne,[39] and his testimony refute this contention. It is rejected as a mitigating circumstance. See Ex parte Harrell, 470 So.2d 1309, 1318 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
(18) Defendant has made attempts to determine why he committed this offense in an effort to help himself and to prevent any further acts of violence by himself.
Discussion: There is not a great deal of evidence to support this assertion and, in any event, it is cumulative. Hence, it is due little, if any weight.
In addition to the nonstatutory mitigating circumstances asserted by defense counsel, this Court notes the following circumstances which are suggested by the evidence or pre-sentence investigative report.
(19) Defendant served in the United States military.
Discussion: Smith joined the United States Army Reserves in 1990. His awards are noted in the pre-sentence investigative report, at page 6. In a letter to this Court, Smith's Platoon Sergeant described him as "nothing but a model soldier" who "was always uplifting to his platoon in times of hard and stressful training."
(20) Defendant had a good work record.
Discussion: In all jobs held after leaving the University of Alabama in Tuscaloosa (see pages 5-6 of the pre-sentence investigative report), Smith was considered by supervisors to be a good, dependable, caring, helpful, and cooperative employee.
(21) Defendant has a child.
Discussion: Defendant is the father of [a child] born ... on June 22, 1994. Prior to his arrest, Smith paid weekly child support without court order. Any weight that might be accorded this circumstance, however, is offset by the fact that Smith showed no mercy in response to Casey Wilson's pleas for his own son.

WEIGHING AGGRAVATING AND MITIGATING CIRCUMSTANCES
In summary, this Court has found that two aggravating circumstances were established *957 by the evidence, beyond a reasonable doubt. Those have been compared to and weighed against: one statutory mitigating circumstance; sixteen nonstatutory mitigating circumstances; and, the advisory verdict of the jury recommending that defendant be sentenced to life without parole. Each aggravating and mitigating circumstance is discussed at length in the previous pages and will not be reiterated here, except to add that, in the judgment of this Court, none of the mitigating circumstances, individually or collectively, are entitled to great weight, especially when considered in relation to the nature of this crime. The jury recommendation, by a majority vote of 7 jurors for life and 5 jurors for death, that defendant be sentenced to life imprisonment without eligibility for parole has been given a weight commensurate with the jury's vote division.
Therefore, following careful and deliberate consideration of all circumstances, this Court is convinced beyond a reasonable doubt that the aggravating circumstances substantially outweigh the mitigating circumstances and jury verdict.
The savage brutality of this killing is shocking. Defendant's acts demonstrate a pitiless indifference to Casey Wilson's fear, pain and suffering, and pleas for life. The most chilling and heinous aspect of this crime is that defendant, unquestionably, enjoyed and reveled in his vile acts.
The United States Supreme Court has recognized that "certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death." Gregg v. Georgia, 428 U.S. 153, 184, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). This is such a crime. In the judgment of this Court, the only penalty which adequately reflects the gravity of the offense, promotes respect for the law, and provides just punishment for the defendant is death.

ORDER OF SENTENCE
Accordingly, it is ORDERED, ADJUDGED, and DECREED that defendant, Ronald Bert Smith, Jr., be, and he hereby is, sentenced to death by electrocution as punishment for the capital offense of which he has been adjudged guilty. The date, place, and time of such execution shall be determined hereinafter by the Supreme Court of Alabama in accordance with Rule 8(d)(1) of the Alabama Rules of Appellate Procedure.
In accordance with the provisions of Alabama Code  12-22-150 and 13A-5-55, it is entered of record that defendant appeals from said judgment of conviction and the sentence of death hereby imposed.
It is further ORDERED that execution of sentence be stayed, pending said appeal.
Finally, this Court shall, by separate order, appoint new counsel to represent defendant on such appeal (who shall be different from defendant's trial counsel, in order that all issues, including the effectiveness of trial counsel, may be raised on such appeal) and provide a free transcript of all proceedings herein.
DONE and ORDERED this 6th day of October, 1995.
NOTES
[1] On return to remand, the Cardwell court affirmed the judgment of the trial court. We determined that the wife had not discussed that case, or any other case pending before the grand jury on which she sat, with her husband, and that she was therefore a competent grand juror. 544 So.2d at 991-92. See also, Eddings v. State, 443 So.2d 1308, 1309-10 (Ala.Cr.App.1983), and Ervin v. State, 442 So.2d 123, 124-25 (Ala.Cr.App.1983), in which we held that, absent evidence of a conflict of interest or disqualifying knowledge, the law partners of part-time assistant district attorneys were competent to serve on the grand jury.
[2] In addition to moving to strike the documents pertaining to the Roundtree case from this record, the State also attached a copy of the record of Chad Roundtree's sentencing hearing as an exhibit in its brief. This exhibit is also not properly before this court. Smith v. State, 675 So.2d 100, 101 (Ala.Cr.App. 1995).
[1] The appellant raised this issue, along with several others, in his motion for a new trial. Rule 21.3, Ala. R. Crim. P., provides, in pertinent part, as follows: "No party may assign as error the court's giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection." See Nichols v. State, 500 So.2d 92 (Ala.Cr. App.1986.)
[2] Ursula Stehle left the courthouse minutes before the hearing on this motion. The defense had subpoenaed her and could have requested that she be required to testify. However, the defense never tried to compel her to testify.
[3] The victim's widow is referred to in the trial court's order as "Sharon Cooper Wilson." However, she identified herself as "Sharon Cooper" while testifying.
[4] Owen Ickes and Monique Ferguson, who is also referred to as Monique Ferguson Ickes, provided the first lead in the case and assisted the police in gathering information about the murder. For a more complete description of their roles, see the trial court's sentencing order, attached to this opinion as Appendix A.
[5] Sharon Cooper is also sometimes referred to as Sharon Cooper Wilson.
[1] Testimony of Philip Chad Roundtree.
[2] Following his arrest, defendant gave a tape-recorded statement to Huntsville Police Department homicide investigator William E. Payne, Jr., which was introduced into evidence as State's Exhibit No. 2. Early in that statement Smith said: "We'd been driving around and we decided that we were going to rob the Circle C on Byrd Springs Road...."
[3] Later in his taped confession, when asked by Investigator Payne to "give me the conversation" that led to the agreement to commit a robbery, Smith said: "There really wasn't much conversation." Even so, it is noted that, "[f]or five or six months in 1992, Smith was employed as a clerk/cashier at [this same] Circle C Convenience Store...." (Pre-Sentence Investigative Report, at page 6.) Consequently, Smith was familiar with the layout of the store.
[4] Testimony of Philip Chad Roundtree.
[5] The precise statements of time which follow were logged by a digital clock, electronically transposed upon a videotape of the incident (State's Exhibit No. 8) recorded by four television security cameras located in different areas of the convenience store. The separate views afforded by each camera were done on a so-called "split screen."
[6] State's Exhibit No. 9: a bottle of "Mountain Dew."
[7] Mr. Wilson was a 26-year-old white male whose date of birth was December 18, 1967.
[8] State's Exhibit No. 4.
[9] Police investigators found blood spatters near the toilet in the restroom that were consistent with such a beating. Dr. Joseph Embry, a forensic pathologist for the State of Alabama who performed the autopsy of Casey Wilson, identified nine non-gunshot wounds to the body, which he attributed to a pistol-whipping of the victim prior to death, none of which was severe enough to kill, or to render the victim unconscious.
[10] This Court believes Casey Wilson sustained the gunshot wound to his left arm during this time, and, that the killing shot was fired nearly two minutes later: see the text at note 15, infra. The testimony of Chad Roundtree indicated the sequence of shots to be: "Pop ... pop, pop, pop," with only a short interval between the first and subsequent shots. However, circumstantial forensic evidence tended to show a different sequence. First is the blood splatters near the toilet noted in the preceding footnote. State forensic experts also testified that blood stains on the wall, inside the restroom, to the left of the door, and approximately eighteen to twenty-four inches above the floor, were consistent with blood compression, as opposed to blood smear stains. Such stains would be produced by the victim if he were in a kneeling position, leaning against the wall. In addition, the pattern of blood stains on the victim's pants, the large pool of blood by the door, and blood splatter patterns on the floor near the door all indicate the victim was in a kneeling position by the restroom door, after he had been shot in the left arm. Dr. Embry testified that the wound to the left arm would cause tremendous bleeding, a fact which is consistent with the pool of blood near the door. Moreover, the victim vomited on the floor of the bathroom; Dr. Embry testified that a person cannot vomit after death; therefore, the victim lived for a period of time after being assaulted by Smith. In addition, the videotape showed Smith standing in the doorway after placing Wilson in the restroom. Smith's right arm appeared to move in a motion similar to that of firing a gun; and, after a brief movement that cannot clearly be seen because Smith stepped partially inside the restroom, Smith again made a similar movement.

For the foregoing reasons, this Court adopts the opinion of Dr. Joseph Embry, who believed the victim was shot in the left arm while standing, fell against the wall, then crumpled into a kneeling or crouching position by the door ("I think the pattern of blood staining on his trousers would indicate that"), and then collapsed onto the floor, where the last two shots were inflicted.
[11] The first time Smith attempted to fire the gun, the shell did not discharge. After Smith shucked the misfired cartridge and rammed another shell into the chamber of the semiautomatic pistol, the gun fired. Investigators found the unfired .45 caliber bullet which was ejected when Smith reset the gun: State's Exhibit No. 17.
[12] State's Exhibit No. 2: defendant's tape-recorded statement (emphasis added).
[13] Zuercher's entry at this time is circumstantially consistent with Smith having fired his pistol at least once, because, when the two of them got out of the pickup truck, Zuercher had told Smith: "he was actually going to be looking out; he said I'll either come in if there's a shot, or I'll just wait for you, you know, he was watching outside. ...." State's Exhibit No. 2 (defendant's tape-recorded statement)(emphasis supplied); see also, the testimony of Philip Chad Roundtree noted in text, supra at note 4.
[14] Smith was asked by HPD homicide investigator Bill Payne whether he tried to open the register, and Smith replied: "Oh yes. .... I pushed the, I can't really, I don't know what the button was, but there was like a say total button or a cash button." State's Exhibit No. 2. When police investigators entered the store, they found an "ERROR" message displayed on the cash register's digital screen, and there was an audible alarm.
[15] See note 10, supra.
[16] State's Exhibit No. 2 (defendant's tape-recorded statement).
[17] The videotape (State's Exhibit No. 8) ultimately was found by police in the seat springs of Smith's pickup truck, pursuant to a "consent to search" form signed by Smith (State's Exhibit No. 6).
[18] Owen Ickes testified that defendant said, "Yeah, I killed the guy at Circle C" in a manner "like he was bragging about it."
[19] State's Exhibit No. 3.
[20] State's Exhibit No. 1.
[21] State's Exhibit No. 2, op. cit. note 2.
[22] Ala. Code 1975,  13A-5-43(d), 13A-5-45(a), 13A-5-46(b).
[23] Ala. Code 1975,  13A-5-46(f).
[24] Ala. Code 1975,  13A-5-47(b).
[25] Ala. Code 1975,  13A-5-47(b), -47(c). See also, Joseph A. Colquitt, Sentencing in Capital Cases, Chapter 5 at 15-16 of a book in progress (June 1, 1995, draft distributed by the Administrative Office of Courts during the 1995 annual meeting of the Alabama Circuit Judges Association).
[26] Ala. Code 1975,  13A-5-47(d).
[27] Ala. Code 1975,  13A-5-45(c), 13A-5-50. See also, Joseph A. Colquitt, Sentencing in Capital Cases, op. cit. note 25, at 22-23:

"Alabama allows `doubling,' i.e., using the same facts to establish both the required `aggravating component' of the capital crime and the required `aggravating circumstance' to support a death sentence. Thus, a jury verdict of guilty in the guilt phase of a capital trial may establish the presence of an aggravating circumstance in the second-stage sentencing hearing without the need for further evidence. For example, a conviction for murder during a robbery in the first degree ... establishes beyond a reasonable doubt the aggravating circumstance that the capital offense was committed while the defendant was engaged in a robbery." (Emphasis added; citations and footnotes omitted.)
[28] Testimony of Josh Zimmerman during third-stage sentencing hearing. (The newborn son of Sharon and Casey Wilson actually was six weeks old.)
[29] See note 17, supra.
[30] See, e.g., ALABAMA PATTERN JURY INSTRUCTIONS ÔÇöCRIMINAL at 3-3 (Feb. 1, 1994 Rev.).
[31] Smith explained he did not want his parents to know he had killed a man over a woman.
[32] Her true name is Ursula Kristine Stehle.
[33] [footnote omitted].
[34] Just prior to that point in the taped confession, Payne asked Smith: "And how did y'all decide on what to rob? Had y'all ever been there before; did you know the guy or whatever?" Smith replied that he had worked at the store "a while back," and then added: "we didn't know...." The remainder of Smith's answer is as intriguing as it is inaudible.
[35] Cf., Jackson v. State, 516 So.2d 726, 757 (Ala.Crim.App.1985):

"As stated by ... Blackstone, `But the law, as it now stands, and has stood at least ever since the time of Edward the third, the capacity of doing ill, or contracting guilt, is not so much measured by years and days, as by strength of the delinquent's understanding and judgment.' Blackstone's Commentaries, Vol. IV, p. 23 (reprint of first edition with supplement, 1966)."
[36] Joseph A. Colquitt, Sentencing in Capital Cases, op. cit. note 25, at 24-25.
[37] Testimony of Josh Zimmerman.
[38] Defendant's father made a first career in the United States Army. He retired in 1986, and since then has worked as a contract specialist for NASA's Marshall Space Flight Center. His mother has been employed as a Registered Nurse for over 30 years. The couple have been married only to each other for 26 years. They had just one biological childÔÇöthe defendantÔÇöbut adopted two other children: ... The State's Attorney said of them in closing argument, "they obviously attempted to raise up a child in the way he should go, in the hope that in his adult life he would not depart from therefrom."
[39] Investigator Payne testified that Smith "was" cooperative during interrogation, but that he "never" exhibited sorrow or remorse.